James P. Keenley (State Bar No. 253106)
Emily A. Bolt (State Bar No. 253109)
Brian H. Kim (State Bar No. 215492)
BOLT KEENLEY KIM LLP
2855 Telegraph Ave., Suite 517
Berkeley, California 94705
Phone: (510) 225-0696
Fax: (510) 225-1095

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO / OAKLAND DIVISION

| | |
|---|---|
| SHARAREH IRAVANI,<br><br>       Plaintiff,<br><br>v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>       Defendant. | Case No.: 3:21-cv-9895-HSG<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><u>**Hearing / Bench Trial**</u><br>**Date: November 3, 2022**<br>**Time: 2:00 PM**<br>**Location: Courtroom 2**<br>**1301 Clay St., Oakland CA 94612** |

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE THAT on November 3, 2022 at 2:00 PM., or as soon thereafter as counsel may be heard, Plaintiff will and hereby does move the Court for judgment pursuant to Federal Rule of Civil Procedure 52(a) as to Plaintiff's claim for benefits brought pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B).

      In support of this motion Plaintiff relies on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of James P. Keenley filed herewith, the

administrative record lodged by Defendant, the complete Court file in this action, and such other matters as may be presented to the Court at the hearing.

Respectfully Submitted,

By:     */s/ James P. Keenley*
        James P. Keenley
        Bolt Keenley Kim LLP
        *Attorneys for Plaintiff*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.    Relevant Plan Terms ............................................................................... 2

    B.    Unum's Unfair Claims Practices and the California Settlement Agreement ........................... 3

    C.    Evidence Supporting Ms. Iravani's Claim ............................................. 4

        1.    Ms. Iravani's History of Chronic Pain, Spinal Disease, and Other Injuries ....................... 4

        2.    Ms. Iravani's Favorable SSDI Claim ........................................... 8

    D.    Ms. Iravani's Claim History With Unum ............................................ 10

III.    LEGAL STANDARDS ..................................................................................... 19

IV.     ARGUMENT ..................................................................................................... 20

    A.    Ms. Iravani Is Disabled Within the Meaning of the Plan ................... 20

        1.    The Medical Evidence Supports a Finding that Ms. Iravani Is Disabled ......................... 21

        2.    The Favorable SSDI Decision Supports a Finding that Ms. Iravani Is Disabled ............... 21

        3.    The Vocational Evidence Supports a Finding that Ms. Iravani Is Disabled .................... 22

    B.    Unum's Change in Position on Ms. Iravani's Claim Lacks Evidentiary Support ................... 23

    C.    Ms. Iravani's Age and Station in Life Make Returning to Work Impossible ..................... 24

V.      CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Cases**

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ................................................................. 19

*Krolnik v. Prudential Ins. Co. of Am.* 570 F. 3d 841 (7th Cir. 2009) ...................................................... 19

*Mackey v. Liberty Life Assurance Company of Boston*, 168 F. Supp. 3d 1162 (2016) ........................ 24

*McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126 (2d. Cir. 2008) ...................................................... 3

*Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938 (9th Cir. 1995)............. 19

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009).............................................. 15

*Moore v. American United Life Ins. Co.*, 150 Cal. App. 3d 610 (Ct. App. 1984) .......................... 20, 24

*Radford Trust v. First Unum Life Ins. Co.*, 321 F. Supp. 2d 226 (D. Mass. 2004) ............................... 3

*Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222 (N.D. Cal. 2003)................ 19

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008)................. 3, 23

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917 (9th Cir. 2012)...................................................... 3

**Rules**

Federal Rule of Civil Procedure 52(a) ................................................................................................... 19

## I.    INTRODUCTION

Plaintiff Sharareh Iravani worked as a beauty specialist for Saks Incorporated, a retail position that involves selling cosmetic products and assisting customers in applying those products.  In 2010, when she was fifty years old, Ms. Iravani became unable to work as a result of degenerative spinal disease, aggravation of that problem caused by her repetitive work tasks, migraine headaches, and myofascial pain syndrome.  She filed a timely claim for long-term disability benefits under a group insurance Policy issued by Defendant Unum Life Insurance Company to her employer, which was approved by Unum on the basis of the medical evidence.

Over the next ten years Unum would repeatedly review and approve Ms. Iravani's claim for benefits, finding again and again that the medical and vocational evidence showed she was unable to work in any gainful occupation that she was qualified to perform.  In January 2021 Unum abruptly changed course and terminated Ms. Iravani's long-term disability benefit payments at the age of 61, less than five years before she would reach the maximum age to which benefits would be paid.

Did Unum have any evidence that Ms. Iravani's medical conditions had improved during the ten years she was on claim, as required by the Ninth Circuit?  No, they did not, they didn't even bother to pretend that they did.  Unum simply concluded that since Ms. Iravani had not had her back and neck problems evaluated for a few years—conditions that multiple doctors had already found disabling despite reaching maximum medical improvement—that her spinal disease and injuries must have been cured despite the degenerative nature of the conditions and the vicissitudes of aging.

Unum's irrational medical conclusions were not themselves sufficient to justify terminating Ms. Iravani's claim because on two previous occasions their own vocational experts had concluded that Ms. Iravani's own occupation was too physically demanding for her to perform and that there were no other occupations that Ms. Iravani was realistically qualified for that would provide a gainful wage.

Undeterred, in late 2020, Unum had a two more vocational analysts re-review Ms. Iravani's work history which led to the blatantly inaccurate factual finding that Ms. Iravani had significant management experience, that she had in fact been responsible for managing ten retail stores, including all the supervisory, planning, and personnel work that would be required of that sort of management

position.  None of that is true, even a cursory look at the underlying evidence shows that this finding is patently incorrect.  But Unum relied on that determination to support its claim that Ms. Iravani has the skills and experience to perform a much broader range of higher-paying occupations than their previous experts had found.

Benefits were then swiftly cut off, depriving Ms. Iravani of income she desperately needs for basic financial survival.  Ms. Iravani appealed that decision, Unum denied that appeal.  And then, not content with having excused itself of approximately $105,985 in future benefit liability on Ms. Iravani's claim, Unum demanded a check from Ms. Iravani for $9,189.50 in "overpaid" benefits.

This case should not be here. Unum's conduct here is reminiscent of the Unum of old, a company that was subject to a massive multi-state market conduct examination by the State of California and forty-eight other states that revealed outrageous claims handling practices and resulted in two major settlements with the people of those states that were supposed to reform Unum's practices.

The standard of review in this matter is de novo.  A preponderance of the evidence shows that Ms. Iravani has been disabled and entitled to benefits under the policy since 2010 and that she remained so when the claim was terminated in 2021.  Judgment should issue to Plaintiff.

## II.   STATEMENT OF FACTS

The facts necessary to adjudicate Plaintiff's claim are established by the evidence in the administrative record lodged by Defendant (ECF No. 30-1-2-3).  For legibility purposes, pin citations to the administrative record are preceded by the letters AR-1, 2, or 3 (corresponding to the volume) and made to the bates pagination applied by Defendant to that record, with redundant zeroes and prefixes omitted.

### A.  Relevant Plan Terms

Ms. Iravani's rights and Unum's obligations are governed by the terms of the Saks Incorporated Long Term Disability Plan, which are set forth in Unum Group Policy No. 949544 001 (located at AR-1 53-96 and referred to herein as the "Policy").  Under the Policy, as relevant here, Ms. Iravani is "disabled" and entitled to monthly benefits if, after the first 24 months of payments (which occurred back in 2012), she is "unable to perform the duties of any gainful occupation for which [she is]

reasonably fitted by education, training, or experience" due to a "sickness or injury" and are "under the regular care of a physician." AR-1 at 68.

The term "gainful occupation" is defined to mean "an occupation that is or can be expected to provide you with an income within 12 months of your return to work that exceeds 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." AR-1 at 83.

### B. Unum's Unfair Claims Practices and the California Settlement Agreement

Plaintiff requests that the Court take judicial notice of Unum's long history of illegal and unfair claims handling practices and the settlement the company entered with the State of California to remedy these misdeeds. Unum has a long and well-known history of "erroneous and arbitrary benefits denials, bad faith misinterpretations, and other unscrupulous tactics" that has been expressly remarked upon by numerous courts, including the Ninth Circuit. *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 933-34 (9th Cir. 2012) citing *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d. Cir. 2008), *Radford Trust v. First Unum Life Ins. Co.*, 321 F. Supp. 2d 226, 247 (D. Mass. 2004), *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008).

Unum's practices caught the attention of state regulators and in 2003 the California Department of Insurance completed a market conduct study that uncovered hundreds of actionable legal violations in a small sampling of Unum's total claims. Declaration of James P. Keenley, Exh. 1. The study ultimately resulted in a settlement with the State of California (the "CSA") that required Unum to make significant changes in how it interprets its policies and in its claims handling practices. Keenley Dec., Exh. 2.[1] The CSA required Unum to reassess thousands of closed claims and to change its claims handling and policy interpretation practices in ways that are highly material to this case. Keenley Dec., Exh. 2 at Part III.

---

[1] Unum entered into a separate multi-state settlement with numerous other states and the practices uncovered by state regulators led to sweeping changes in how disability insurance is regulated around the country. The Ninth Circuit has described these events as a "nationwide vote of no confidence" that was "precipitated by the cupidity of one particular insurer, Unum." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008).

Specifically, the CSA requires Unum to "give significant weight to an attending physician's opinion" and Unum agreed that in order for it to reject an attending physician's opinion, "the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record." Keenley Dec. Exh. 2 at Part III.D (page 9).

Unum also agreed in the CSA to change the definition of disability that appears in Ms. Iravani's policy for "any occupation," such that disability during the any-occupation period shall be defined as:

> A disability that renders one unable to perform with reasonable continuity the substantial and material acts necessary to pursue his or her usual occupation in the usual and customary way and to engage with reasonable continuity in another occupation in which he or she could reasonably be expected to perform satisfactorily in light of his or her age, education, training, experience, station in life, and physical and mental capacity.

Keenley Dec., Exh. 2 at Part V.D.1 (page 13).  This change requires Unum to consider Ms. Iravani's age and station in life when assessing her claim under the "any occupation" definition, which Unum did not do, and it applies to any policy that renews after the CSA's 2005 effective date, including Ms. Iravani's policy, which renews annually on its January 1 anniversary date.  AR-1 at 54.

**C.  Evidence Supporting Ms. Iravani's Claim**

The evidence supporting Ms. Iravani's claim is substantial and comes in the form of numerous reports from treating physicians, comprehensive medical-legal evaluations performed for her worker's compensation claim, claim forms completed by her doctors, medical records documenting her consistent complaints of pain, objective imaging studies showing the disease processes in her spine, the favorable determination of her SSDI claim and the analyses conducted by Unum's own employees.

**1.  Ms. Iravani's History of Chronic Pain, Spinal Disease, and Other Injuries**

Ms. Iravani had endured chronic neck pain for many years prior to it becoming too difficult for her to continue working.  AR-1 at 187, 189.  Beginning in late 2009, as she approached age 50, her most difficult symptoms, consisting of constant bilateral neck pain, numbness and pain in her left arm, and associated migraine headaches, got worse and were interfering with her activities of daily living. AR-1

at 185, 189.  She underwent an MRI of her cervical spine in January 2010 (AR-1 at 192-193), and the findings were significant: showing "disc degenerative changes and straightening of the cervical spine . . . disc protrusion/herniation producing mild central stenosis and foraminal stenosis . . . there is also a loss of disc height and disc bulging and osteophyte findings and central stenosis." AR-1 at 190.  Ms. Iravani would have a lumbar MRI in June 2011 that documented similar degenerative changes in her lumbar spine as well.  AR-1 at 599.

In June 2010, Robert Savala, M.D., an orthopedic surgeon, concluded based on the MRI studies and his physical examination of Ms. Iravani that she was properly diagnosed with cervicalgia (i.e., neck pain), bilateral upper extremity C6 radiculopathy[2], cervical spondylosis at C5-C6 and C6-C7, cervical spinal stenosis at C5-C6 and C6-C7.  AR 1 at 190.  Dr. Savala, relying on the MRI, opined that Ms. Iravani's pain symptoms were likely coming from the middle portion of her cervical spine, recommended she undergo an epidural steroid injection, and believed she was a possible candidate for surgery.  AR-1 at 191.  Dr. Savala performed the injection on June 15, 2010 and completed an attending physician statement for Unum recommending she stay off work until at least July 15, 2010.  AR-1 at 121.  Ms. Iravani was then evaluated by Edward Sun, M.D., another orthopedic surgeon, two weeks after the epidural injection, which had resulted in only "minimal improvement of her neck pain."  AR-1 at 184.  Dr. Sun concurred with Dr. Savala that Ms. Iravani should start physical therapy and stay off work until at least July 15, 2010.  AR-1 at 184.  Ms. Iravani promptly followed up on Dr. Sun's recommendations and began physical therapy a few days later.  AR-1 at 169-177.

Ms. Iravani believed that her work, which required a significant amount of upper extremity reaching and lifting, contributed to her worsening symptoms of neck and arm pain and migraine

---

[2] Radiculopathy is often referred to in lay parlance as a pinched nerve, it is an injury to nerve roots as they leave the spine that is the result, in Ms. Iravani's case, of degenerative disc disease and, per the findings of the QME physicians who evaluated her worker's compensation claim injury caused by the repetitive reaching she performed day-in-day-out as a cosmetics salesperson.  *See* PennMedicine, *Radiculopathy (Nerve Root Disorder): What Is Radiculopathy*, available at https://www.pennmedicine.org/for-patients-and-visitors/patient-information/conditions-treated-a-to-z/radiculopathy#:~:text=What%20Is%20Radiculopathy%20%3F,disc%20herniation%20or%20other%20trauma.

headaches, and accordingly she filed a claim for workers' compensation benefits and began treating with Massoud Nassiri, D.C., a qualified medical evaluator, in August 2010.  AR-1 at 335.  Dr. Nassiri conducted numerous physical examinations of Ms. Iravani (11 between August and December 1010, AR-1 at 335) and found that her range of motion was significantly restricted (AR-1 at 338), that she had tenderness and muscle spasms in her paravertebral muscles, myofascial pain and trigger pain in her neck, suboccipital area, upper trapezius, shoulder blades, upper back and paravertebral muscles. AR-1 at 338.  Based on his physical examinations and treatment Dr. Nasiri diagnosed Ms. Iravani with cervical disc syndrome, cervical sprain, thoracic sprain, lumbar sprain, and segmental dysfunction along her entire spine, among other conditions.  AR-1 at 339.

Dr. Nasiri concluded that Ms. Iravani could return to work in October 2010, but only if her employer could accommodate a number of restrictions including no more than 4-6 hours of work per day, no lifting, pushing or pulling over 5-8 pounds, and no firm grasping or repeated use of hands.  AR-1 at 340.  In February 2011, one of Unum's in-house physicians, Richard Maguire, M.D. reviewed Dr. Nasiri's reports (along with other medical records) and concluded her restrictions were not compatible with the physical demands of her occupation.  AR-1 at 403-409.  Dr. Nasiri continued to treat Ms. Iravani, conducting numerous examinations and preparing near monthly reports for her workers' compensation claim, in addition to completing forms certifying Ms. Iravani's ongoing disabling conditions for Unum over the next couple of years.  AR-1 at 524-531; 642-699; 656-658, 659-661, 663-699, 737-754, 782-790, 824-832, 907-909, 910-918.

Despite her consistent treatment, Ms. Iravani's condition did not improve to a level that she could return to work, which is not surprising considering that her conditions are degenerative in nature and she was getting older.  In March 2012 she was evaluated in connection with her workers' compensation claim by Ernest Cheng, D.O., Dr. Cheng, after a review of her medical records and imaging studies, and his own personal examinations, concluded that Ms. Iravani was suffering from chronic bilateral lumbar radiculopathy, and further that she had reached maximum medical improvement of this condition and still had ongoing disabling pain, noting that he had previously rendered similar findings with respect to her cervical pain.  AR-1 at 931.  Dr. Cheng found that Ms. Iravani was partially

permanently disabled under the workers' compensation rules, with a 7% whole person impairment due to her lumbar spine and an 18% whole person impairment due to her cervical spine, for a combined 24% whole person impairment from these conditions alone.  AR-1 at 932.

Shortly thereafter, in July 2012, Dr. Nasiri conducted a comprehensive medical-legal evaluation in connection with Ms. Iravani's workers' compensation claim.  AR-1 at 981-998.  Dr. Nasiri concurred with Dr. Cheng that Ms. Iravani had reached maximum medical improvement of her orthopedic injuries, and that she nonetheless remained disabled due to her permanent restrictions.  AR-1 at 987-988.  Dr. Nasiri concurred with Dr. Cheng's impairment ratings for Ms. Iravani's lumbar and cervical spine, and also found that she had additional impairments in her thoracic spine, upper extremities, and due to her pain symptoms themselves, finding that her total whole person impairment was 42%, which represents a significant reduction in Ms. Iravani's future earning capacity.[3] AR-1 at 987-988.

Ms. Iravani's workers' compensation claim for temporary total disability was approved and paid for the maximum duration of 104 weeks, which represents a finding by the workers' compensation doctors and carrier that Ms. Iravani could not work[4] for this period of time and was entitled to wage replacement benefits, benefits which in turn allowed Unum to reduce its own liability by $51,262.07. AR-1 at 1004.

In late 2012, Ms. Iravani began treating with Eduardo Lin, M.D., a pain specialist, again in connection with her workers' compensation claim.  AR-2 at 1250-1290.  Dr. Lin's reports document that Ms. Iravani was continuing to suffer from worsening neck and lower back pain and headaches, he repeatedly examined her (on at least 10 occasions in 2013 alone) and found that she had decreased range of motion in her cervical and lumbar spine and myofascial trigger points in her cervical and lumbar

---

[3] For workers' compensation purposes this represents Ms. Iravani's loss of future earning capacity due to these conditions, i.e., her future earning capacity was reduced by 42% and she received a corresponding permanent disability payment from her workers' compensation claim.  *See* State of California, "Schedule For Rating Permanent Disabilities Under the Provisions of the Labor Code of the State of California" *available at* https://www.dir.ca.gov/dwc/PDR.pdf.

[4] *See* State of California Department of Industrial Relations, *Guidebook Chapter 5: Temporary Disability Benefits*, *available at* https://www.dir.ca.gov/InjuredWorkerGuidebook/Chapter5.pdf.

paraspinal musculature, diagnosing her with cervical and lumbosacral injuries, lumbosacral radiculopathy, and myofascial pain syndrome.  AR-1 at 1250, 1253, 1255, 1262, 1267, 1271, 1275, 1280, 1285, 1289.

In March 2014, Ms. Iravani was again evaluated by a different pain specialist, Dennis Yun, M.D., who reviewed her medical records and conducted a thorough in person examination.  AR-2 at 1424-1431.  Dr. Yun concurred with all the other doctors, finding that Ms. Iravani had cervical and lumbar radiculopathy and was totally disabled by these conditions.  AR-2 at 1429-1430.

Ms. Iravani was diligent about seeking treatment for her pain symptoms.  She continued to treat with Dr. Lin throughout 2015 and 2016, consistently presenting with the same pain symptoms, and he continued to find that she had significant cervical and lumbar injuries and myofascial pain syndrome, and recommended ongoing conservative treatment with medication, chiropractic care, and a back brace. AR-2 at 1871-1873.  In June 2016, he completed forms for Unum certifying that Ms. Iravani was disabled by her pain with significant restrictions of no pushing, pulling, or lifting greater than 10 pounds, no sitting longer than 20 minutes, and no repetitive work movements with her upper extremities. AR-2 at 1915-1917.

Ms. Iravani has continued to treat her pain with Dr. Lin up through and beyond the termination of her claim in 2021, and his findings have been consistent.  For example, on August 31, 2020, he certified that Ms. Iravani was "permanently disabled" with the restriction of no lifting, pushing or pulling over 10 pounds.  AR-3 at 2674.  At that examination, Dr. Lin had found that Ms. Iravani's pain had worsened, ranging between 6 and 9 in her back and neck on a 1-10 scale, that she had decreased range of motion, and local muscle spasms.  AR-3 at 2686-2688.  In March 2021, in direct response to letters that had been sent to him by Unum, Dr. Lin again confirmed that Ms. Iravani was significantly disabled by her pain symptoms and unable to meet the occupational demands of a full-time job.  AR-3 at 2825-2828.

### 2.  Ms. Iravani's Favorable SSDI Claim

Because she was receiving disability benefits through her workers' compensation claim, Ms. Iravani, with Unum's express approval, did not apply for SSDI benefits at the outset of her disability

because her workers' compensation benefits would be a total offset for her SSDI benefits. AR-1 at 971. However, in 2016, Unum, presumably believing in good faith that Ms. Iravani met the criteria for receiving SSDI benefits, arranged for her to be represented in that process by Genex, Unum's vendor for such services. AR-2 at 1846. Genex proceeded to file Ms. Iravani's claim and subsequent appeals, resulting in an ALJ hearing in February 2018. AR-2 at 1945, 1970; AR-3 at 2124.

The matter was heard by Administrative Law Judge John J. Flanagan, who issued a fully favorable decision on June 26, 2018. AR-3 at 2121-2124. The decision strongly supports Ms. Iravani's claim in this case. Judge Flanagan found that Ms. Iravani "has the following severe impairments: physically chronic neck strain/sprain, bilateral cervical radiculopathies, chronic low back strain/sprain, bilateral lumbar radiculopathies, left frozen shoulder, and a history of myofascial pain syndrome" which he concluded, "significantly limit the ability to perform basic work activities." AR-3 at 2126. He went on to find that Ms. Iravani was entirely precluded from "reaching and working with the left hand above shoulder level" and that she would require a "sit/stand option every 30 minutes to control her pain" be "restricted to performance of simple repetitive tasks but would not be able to maintain consistent attendance," would "have difficulty interacting with supervisors, adapting to routine changes, tolerating the stress of day-to-day work activity" and, lastly, "would not be able to attend, sustain effort, comprehend or remember work tasks without additional supervision." AR-3 at 2127.

Judge Flanagan also heard sworn testimony from Ms. Iravani at the hearing in which she testified about her ongoing struggle with pain in her neck, back, knees, shoulders, head and migraine headaches. AR-3 at 2129. Judge Flanagan found that Ms. Iravani's subjective complaints of pain were highly credible and entitled to significant evidentiary weight because they were consistent with the medical evidence provided by her treating physician, Dr. Lin, and the findings of consultative experts hired by the Social Security Administration to evaluate her. AR-3 at 2129.

Ultimately, Judge Flangan found that Ms. Iravani "is unable to perform any past relevant work" and that her "acquired job skills do not transfer to other occupations within [her] residual functional capacity." AR-3 at 2129-30. He noted that at the hearing a vocational expert testified that Ms. Iravani "would not be able to perform any type of competitive work activity" which led Judge Flanagan to

conclude that "considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform." AR-3 at 2130.

**D.  Ms. Iravani's Claim History With Unum**

Ms. Iravani first became disabled within the meaning of the Policy on June 15, 2010.  AR-1 at 11.  She satisfied the Policy's elimination period – a time during which the participant must be continuously disabled before benefits are paid – on December 12, 2010.  AR-1 at 11.  After conducting an investigation and obtaining information from Ms. Iravani's doctors, Unum approved her initial claim for benefits on February 4, 2011, retroactive to her first day of disability.  AR-1 at 421-429.

Unum's initial determination that it was liable to pay benefits did not change until January 7, 2021, ten years later.  AR-3 at 2795-2806.  Prior to then Unum did reviewed the claim numerous times, collecting updated evidence from Ms. Iravani and her doctors, and repeatedly affirming its original conclusion that her medical conditions made it impossible for her to work.

For example, in April 2012, Kathy Pepin, an in-house nurse, reviewed the medical evidence and concluded that Ms. Iravani suffered from "a long history of cervical pain that has continued to have flare ups with minimal lasting benefits from treatment" that the medical records "support that [Ms. Iravani] has continued to have appropriate treatment for her pain . . . and that there is adequate information to assess the existence, intensity frequency, and duration of . . . the reported cervical spine symptoms." AR-1 at 903.  Nurse Pepin went on to observe that Ms. Iravani also had "chronic lumbar DDD [degenerative disc disease]" findings which led Nurse Pepin to conclude that Ms. Iravani did not have the capacity to perform "light work" due to her spinal disease and the pain it causes, meaning that Ms. Iravani was unable to apply 20 pounds of force occasionally, or 10 pounds of force frequently, nor frequent standing and walking, reaching, handling, or talking, all requirements of her line of work.  AR-1 at 904.  Nurse Pepin finished her report with the sobering conclusion "prognosis for increased functional demand is poor based on lack of improvement even with extensive care." AR-1 at 904.

Nurse Pepin's findings were accompanied by a vocational expert's report prepared by Terri Hardiman, a certified vocational rehabilitation consultant employed by Unum to review Ms. Iravani's

file.  AR-1 at 955-956.  Ms. Hardiman concluded, after reviewing the evidence, that while Ms. Iravani did have skills that would translate to less physically demanding sedentary occupations, those occupations were all low-wage occupations that would not constitute a "gainful occupation" within the meaning of the Policy.  AR-1 at 956.  The evidence of Ms. Iravani's disability was so strong that the analyst assigned to her claim concluded that it should approved beyond the 24 month change in what disability to "any occupation" disability "early" (AR-1 at 963) and in fact referred the claim to a department tasked with "reduced handling," recommending further review in twelve months.  AR-1 at 961.  Unum subsequently sent Ms. Iravani a letter on May 30, 2012, announcing the favorable determination and informing her that "based on the current information we have about your Long Term Disability claim, medical and financial updates will not be requested less often."  AR-1 at 964.  After that, in July 2012, Ms. Iravani underwent an independent medical examination at Unum's behest that also concluded she was precluded from performing her occupation.  AR-2 at 1450.

For the next nine years, Unum would continue requesting updated information from Ms. Iravani and her doctors on an annual basis, and after reviewing this evidence it repeatedly affirmed its original conclusion that Ms. Iravani was disabled and entitled to benefits.  For example, in September 2013, claims analyst Jennifer Mullett concluded that Ms. Iravani "does not have" the capacity to perform light occupational demands "on a predictable and sustainable level . . . due to her ongoing pain complaints to the cervical and lumbar spine." AR-2 at 1109.  Then, in May 2014, Ms. Mullet noted a return to work was "unfeasible" for Ms. Iravani due to her physical limitations and pain levels and the fact that she "has not gained further occupational skills."  AR-2 at 1450.

In May of 2016, Unum referred Ms. Iravani to its SSDI claim assistance vendor, Genex presumably because Unum had a good faith belief that Ms. Iravani met Social Security's rigorous standards – a claimant must be unable to perform any substantial gainful work in the national economy to qualify – and therefore had a valid claim.  AR-2 at 1846.  That effort resulted in a fully favorable determination and award of benefits two years later.  AR-3 2121-2124.  Which in turn allowed Unum to significantly reduce its monthly benefit liability on a retroactive and forward going basis.

In July 2016, Unum understood and acknowledged that Ms. Iravani was disabled and would remain that way, noting in their "Action Plan – Key Actions and Rationale" that the file direction was "maximum duration" because, based on Ms. Iravani's history of cervical pain with radiculopathy, and the lack of any evidence that her activity level had improved over the course of the claim, "ongoing restrictions and limitations are supported." AR-1 at 13. Accordingly, Unum again wrote to Ms. Iravani, stating that after reviewing the information she had provided in response to their requests that they had concluded she continued to be eligible for benefits under the policy. AR-2 at 1929.

The claim was reviewed again in July 2017 (AR-2 at 2035), with Unum again concluding in August 2017 that the information they received from her physician was sufficient to continue approving the claim (AR-3 at 2049). In September 2017, a new claims analyst, Kassandra Perrone, reviewed all the available and most up to date evidence and concluded that Ms. Iravani's diagnoses and symptoms "remained consistent with no improvement in functional capacity" and that Ms. Iravani "would not have capacity to return to work." AR-3 at 2053-54. Unum's underlying substantive analysis would remain consistent from Ms. Perrone's September 2017 conclusion all the way until January 7, 2021, when Unum first denied the claim. AR-3 at 2795-2806.

Unum did, however, begin investigating Ms. Iravani's claim more aggressively starting in October 2019 when, in response to one of Unum's regular requests for additional information, Ms. Iravani reported that she had lost her health insurance and was thus without a current doctor following settlement of her worker's compensation claim.[5] AR-3 at 2251. Sensing the opportunity for Unum, the claims analyst assigned to that claim at the time concluded that he was "unable to determine current capacity level as EE no longer has treating providers" and recommended the claim be moved to "DBS" a unit that conducts more aggressive claim investigations. AR-3 at 2277.

Fortunately, Ms. Iravani was able to secure new health coverage fairly quickly through Covered California and began receiving care at Kaiser, so the immediate problem of her lack of a treating physician was promptly resolved by January 2020. AR-3 at 2381. But Unum persisted with an invasive investigation, requiring Ms. Iravani to complete work history forms that she had already completed

---

[5] Ms. Iravani's most pertinent medical care, the care for her spinal disease and related injuries, was provided through her employer's worker's compensation policy, and is addressed in detail below.

multiple times previously (AR-3 at 2462-2468) and conducting another vocational review, this time by Carrie Cousins, another certified vocational rehabilitation consultant.  Ms. Cousin's review, much like that of Ms. Hardiman back in 2012, concluded that Ms. Iravani would not be able to find occupations within her physical restrictions that paid a gainful wage.  AR-3 at 2502-03.

Undeterred by yet another one of its employees concluding Ms. Iravani could not work, Unum pressed on: commissioning a comprehensive public records check in July 2020 (AR-3 at 2614-2628), followed by full blown surveillance in October 2020 (AR-3 at 2703-2710).  Neither effort yielded any information contradicting Ms. Iravani's claim, indeed Ms. Iravani was not observed at all during two full days of surveillance outside her home, which is consistent with what she has consistently reported to Unum and others about her activity levels (which are very minimal due to her back and neck pain). AR-3 at 2703-2710.

Even though the surveillance did not raise any grounds for concern, Unum had another analyst, Rebecca Mason, conduct a review of Ms. Iravani's claim and she reported as follows: "based on review of the information on file, it is unclear what precludes the [claimant] from performing the demands of her own occupation." AR-3 at 2631.  It is hard to take Ms. Mason's claim to have reviewed all of the information on file seriously, as there is plainly quite a lot of documentation of Ms. Iravani's disabling back problems that caused numerous other Unum employees to repeatedly recommend approving her claim.  It appears instead that Ms. Mason based her conclusions primarily on Ms. Iravani's new Kaiser medical records from January 2020, which only consisted of a basic wellness exam that was not intended address the spinal disease and chronic pain problems that have kept Ms. Iravani out of the workforce for more than a decade.  AR-3 at 2631.

Ms. Mason's efforts eventually led to the claim being sent for an "on site physician review" by Stewart Russell, D.O.  AR-3 at 2722-2726.  Dr. Russell concluded that no restrictions or limitations were warranted.  AR-3 at 2724.  Dr. Russell's findings were not based on any medical evidence that Ms. Iravani had improved, instead, his determination was based on absurd criteria, such that Ms. Iravani preferred to take over-the-counter medications (as opposed to prescription narcotics) to manage her pain symptoms, and that she had not had treatment for her neck and back pain since 2017.  AR-3 at 2725.

Putting aside the illogical nature of Dr. Russell's critique that Ms. Iravani was "only" treating her back and neck pain with Tylenol while somehow also not receiving any treatment for said pain, Dr. Russell's analysis also conveniently overlooks the fact that multiple of Ms. Iravani's treating concluded she had reached maximum medical improvement, which necessarily meant that she would be seeking treatment much less frequently.

Dr. Russell's conclusions were still not sufficient to justify denying Ms. Iravani's claim because, among other reasons, they were in direct contradiction to the findings of Unum's own vocational experts and with information provided by Ms. Iravani's treating physician at the time, Eduardo Lin, M.D., who had the benefit of actually examining Ms. Iravani and treating her. AR-3 at 2825-2828. Unum, rather than giving Ms. Iravani's treating physician his due regard, forged ahead and ordered another medical review from another in-house employee, Jamie Lewis, M.D. AR-3 at 2730-31. Dr. Lewis was likewise unable to identify any evidence that Ms. Iravani's back and neck conditions had improved, but she still dismissed Ms. Iravani's pain solely on the basis that Ms. Iravani has received conservative treatment for these conditions and rubber-stamped Dr. Russel's opinions, reproducing them verbatim in her report, as though cut and pasted. AR-3 at 2730-31.

Now possessed of two internal physician reports finding that Ms. Iravani had, between the ages of 50 and 61, somehow gone from significantly impaired by degenerative spinal disease to not impaired at all, one might expect that Unum's claims analysts would feel comfortable terminating benefits. But no, Unum's employees still did not feel this way. On December 3, 2020, Susan Goan, a quality control consultant, reviewed the evidence and other Unum employees' analysis of that evidence and stated "I am unable to support a non-compensable determination at this time." AR-3 at 2738. Ms. Goan concluded that despite the medical reviews finding no disability, the claim could not be terminated because "we have not afforded significant weight to the SSA determination that the insured is incapable of performing [her own occupation] level of functional capacity." AR-3 at 2739. Ms. Goan suggested that the case be referred for further workup, including another vocational assessment. AR-3 at 2740.

On December 9, 2020, a "forum" was held with several Unum employees to discuss the claim and review the evidence, including the current claims analyst, a director (the analyst's boss), a clinical

representative (a nurse), *two* doctors, a vocational consultant, and Ms. Goan, the quality control consultant. AR-3 at 2745-46.  The result of this discussion was that the group concluded that "an IME is needed to assess current [functional capacity]."  AR-3 at 2746.  Did Unum ever commission the independent medical examination that seven of its employees—including a nurse and two doctors—jointly concurred should be conducted in order to determine Ms. Iravani's functional capacity?  No, it absolutely did not.[6]  The forum group also concluded that yet another "skills assessment" should be performed by a vocational consultant (AR-3 2746), the third in the claim history, which would ultimately be the final and most ridiculous domino to fall in Unum's reasoning.

The vocational re-re-review was conducted without any further input from Ms. Iravani two days later by Norma Parras-Potenzo.  AR-3 at 2747.  Ms. Parras-Potenzo described the question put to her by the forum as "considering EE's reported supervisory and managerial experience and SSDI favorable decision, does EE have skills for Sedentary work?"  AR-3 at 2747.  Ms. Parras-Potenzo, reviewing the exact same information about Ms. Iravani's work history and educational background, which consisted entirely of a series of hourly wage retail positions and some direct sales work for Avon, concluded that the prior reviews by Unum's own in-house vocational experts and the Social Security Administration's vocational expert were wrong because they all failed to consider Ms. Iravani's experience and skill in personnel interviewing, training, management, event planning, and "8+ years' experience in sales that directly transfer to other industries."  (AR-3 2750).

Among the more ridiculous, and significant, of Ms. Parras-Potenzo's claims is that Ms. Iravani was "in charge of 10 stores, coordinating and arranging events, hiring new staff and training new hires."  AR-3 at 2750.  Where did that information come from and why hadn't the three prior vocational experts spotted it?  Per Ms. Parras-Potenzo, it came from Ms. Iravani herself who allegedly reported that between 2003-2004 she worked as a "supervisor" for Clarins (a cosmetics brand) with job duties that "involved *managing* 10 stores," later described in the same report as being "in charge of 10 stores."

---

[6] Relying on "pure paper" reviews instead of the reports of examining physicians is a practice that courts have long criticized as raising "questions about the thoroughness and accuracy of the benefits determination."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009).  The situation is all the more suspect here because Unum's own employees advised that the company should obtain an independent examination and instead the company proceeded with a paper review.

AR-3 at 2749-2750.  Being in charge of the management of ten retails stores is a big job. Prior to working for Clarins, Ms. Iravani worked as a seamstress/tailor for Saks in their retail stores (AR-3 at 2464), which would not seem to make her a qualified candidate to jump into a high-level management position of multiple retail stores.  It also seems curious that three other experts, including Social Security's, had missed this significant managerial experience, and stranger still that Ms. Iravani's subsequent employment was all in retail level customer service type positions.  What happened to her promising management career?

It turns out that Ms. Parras-Potenzo's account of Ms. Iravani's report of her work is a gross distortion of what Ms. Iravani actually reported in her work history questionnaire.  Ms. Iravani reported that she worked for Clarins, which again is a cosmetic brand that does not have its own stores, and described her job duties as "I had 10 Macy's & helping customer to learn about their skin, how to take care of it, teaching new sales person, make their goals for this month." AR-3 at 2464.  In response to a question "Did you supervise others?" on the form, Ms. Iravani wrote "Yes, train new person, interviewing, making their goals, and help them to make it." AR-3 at 2464.  Clearly, what Ms. Iravani is describing is the job of a travelling cosmetics sales rep, she would go around to different Macy's department stores and interact directly with customers providing beauty advice and helping other retail sales employees with tips for how to sell more of Clarins' products.  She did not "manage" these Macy's, she did not even work for Macy's.  She did not hire personnel, interview candidates, or plan events.  She did not manage any stores at all, at any point in her career, much less ten at one time.

Ms. Parras-Potenzo's report led to a further vocational report, prepared by Amanda Marosy on December 14, 2020.  AR-3 at 2752-2755.  Ms. Marosy took the analysis to dizzying new heights: concluding that in addition to her experience as a cosmetics salesperson, Ms. Iravani also had consistent experience as a Retail Sales Manager (this is based entirely on Ms. Parras-Potenzo's blatantly false claim that Ms. Iravani managed ten retail stores), and for the first time, as an "Alteration Tailor" – a line of work Ms. Iravani had not performed since 2002 (AR-3 at 2465).  AR03 at 2752.  Ms. Marosy went on to conclude that there were alternate occupations that Ms. Iravani could perform based on "her work

experience and skills" in multiple domains that were not a part of any of Ms. Iravani's actual jobs such as "personnel hiring/scheduling" and "event planning" and "management experience."  AR-3 at 2754.

Not content to stop there, Ms. Marosy further found that Ms. Iravani had skills that qualified her to perform jobs in the "work group" known as "Craft Technology" which consists, in Ms. Marosy's own words, of occupations that involve "performing highly skilled hand and/or machine operations, utilizing special techniques, training and experience" in work settings such as "construction sites, machine shops, manufacturing establishments, and processing plants," needless to say Ms. Iravani has never worked in such settings, nor does she have any such skills beyond basic tailoring skills in a retail setting that she last used professionally 20 years ago.  AR-3 at 2754.

The reevaluation of Ms. Iravani's work skills got even loftier with Ms. Marosy's conclusion that Ms. Iravani also possesses the skills to perform jobs in the work group known as "Business Administration."  AR-3 at 2755.  The jobs in this work group involve "directing and working through lower level supervisors to establish policies, set priorities, and render decisions in administering or managing all or part of the activities of public and private establishments and agencies." AR-3 at 2755. The skills needed to perform these jobs, skills Ms. Marosy apparently believed Ms. Iravani possessed, include "analyzing and interpreting mathematical information in written or diagrammatic form, speaking to large groups and writing clearly and authoritatively . . . planning long range or future projects; directing the work of others; [and] working with complex financial and statistical data."  AR-3 at 2755. Again, even a cursory review of Ms. Iravani's work experience as a retail level cosmetics salesperson— jobs where she directly interacted with customers in order to sell them cosmetic products—shows that she does not have the work experience that would qualify her to work in business administration positions, Ms. Marosy's contrary conclusions are utterly ridiculous.

Following her conclusions about Ms. Iravani's skillset, Ms. Marosy went on to identifying three generic jobs, not actual job openings in Ms. Iravani's geographic area, but just three generic job tiles that she thought Ms. Iravani could perform:  Inside Sales Representative, Hotel Sales Representative, and Personnel Scheduler.  (AR-3 at 2755).  What are the typical duties of these occupations and how does Ms. Iravani's work experience as a cosmetics salesperson make her qualified for those duties?  Ms.

Marosy does not tell us, so we do not know.  Does Ms. Iravani have any realistic chance of securing employment in these hypothetical occupations, outside of the cosmetics industry, at age 61, after being out of the workforce for ten years, and with her most recent work experience being entirely in retail cosmetics sales?  Ms. Marosy's report has nothing to say about these questions either, but common sense would suggest that Ms. Iravani would find it extremely difficult to obtain such employment in her circumstances.

Despite the obvious flaws in Ms. Parras-Potenzo and Ms. Marosy's reports, they passed another quality control review (which amounted to little more than parroting their conclusions without reviewing the underlying evidence) and Unum accordingly decided to terminate Ms. Iravani's benefits on January 7, 2021.  AR-3 at 2790.  The letter explaining Unum's determination relies heavily on the physician reviewer findings that because Ms. Iravani has only had conservative treatment for her back pain since 2017 and because there has been no "escalation of treatment" that this somehow amounts to reliable medical evidence that her back and neck conditions, previously considered disabling and repeatedly documented as having reached maximum medical improvement, have now gotten better, allowing her to return to work at age 61.  AR-3 at 2800.  Unum also relied on Ms. Marosy's fundamentally flawed vocational report to justify deviating from the Social Security Administration's contrary conclusions, and in so doing failed to even report the contents of that report accurately, identifying "Information Sales Representative" as one of the alternative occupations that Ms. Iravani could perform.  AR-3 at 2800.  Does that occupation appear in Ms. Marosy's report?  No, it does not.  Does it exist at all?  Do we have any information about the duties or the experience or skills required to perform it?  No, we don't.

Ms. Iravani appealed Unum's decision, submitting a statement from her treating doctor Eduardo Lin that was provided on a letter Unum sent to Dr. Lim for this express purpose.  AR-3 at 2825-26.  In response to Unum's questions Dr. Lin stated on March 3, 2021 that Ms. Iravani was unable to perform the occupational demands Unum identified on a full-time basis due to chronic pain and difficulty sitting for prolonged periods.  AR-3 at 2826.  Ms. Goan, the quality control consultant, correctly identified that Dr. Lin's responses were new and should be reviewed by the in-house doctors (AR-3 at 2829), but then Dr. Russell dismissed Dr. Lin's statements as having "no new information" and concluded that Dr. Lin's

report that Ms. Iravani had "chronic pain which precludes from prolonged sitting" has "no relationship whatsoever to the conditions she went out of work for on 6/15/2010."  AR-3 at 2831.  Dr. Russell does not elaborate further on how it could be possible that degenerative neck and back conditions combined with chronic myofascial pain and migraine headaches, conditions that everyone—Unum's employees, the workers compensation qualified medical examiners, the ALJ who decided the SSDI claim—agreed rendered Ms. Iravani unable to work for over ten years have "no relationship whatsoever" to her current pain and difficulty sitting.  He is just putting words on paper, he offers no reasoning and there could not be any coherent reasoning to support such a transparently illogical conclusion.

But Unum sided with Dr. Russel over Ms. Iravani's treating physician again, upholding its decision on March 9, 2021.  AR-3 at 2834.  There followed a more formal appeal by Ms. Iravani, who at this point did not have much else to offer in terms of additional medical evidence beyond the reams of it already in the file.  Unum had that appeal reviewed by another in house doctor (again declining to commission the IME that their own employees had recommended), and that doctor parroted the conclusions of the previous file reviewers.  AR-3 at 2859-2862.  Unum issued a final denial of the appeal on May 4, 2021 (AR-3 at 2865), this litigation followed.

## III.   LEGAL STANDARDS

Plaintiff's motion is brought pursuant to Federal Rule of Civil Procedure 52(a).  The parties have stipulated that the Court should apply a de novo standard of review.  (ECF No. 16).  Under this standard of review the Court makes an independent decision about what the terms of the Policy mean and how they should be applied to the facts of the case.  *Kearney*, 175 F. 3d at 1088; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-113 (1989). The evidence before the Court includes the "administrative record" and any other evidence that the Court, in its discretion, finds necessary to "enable the full exercise of informed and independent judgment."  *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995). Plaintiff bears the burden of proof to show, by a preponderance of the evidence, that she is entitled to the benefits provided by the Policy. *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    ARGUMENT**

Plaintiff's motion for judgment should be granted, and Unum's decision to terminate her claim overturned, because a clear preponderance of the evidence shows that Ms. Iravani suffers from degenerative spinal disease and other conditions that cause her severe pain that make it impossible for her to work in any capacity.  For ten years, Unum's own employees—claims analysts, vocational experts, nurses, and in house doctors—concluded based on this evidence that Ms. Iravani was disabled within the meaning of the Policy and entitled to benefits.

Unum's radical change in position in 2021 depends on vocational expert reports that contain glaring factual inaccuracies and rests on the illogical premise that Ms. Iravani's well documented neck and back conditions must be better now simply because the frequency of her medical appointments declined as she exhausted her workers' compensation benefits and reached maximum medical improvement.  Unum did not place significant weight on the opinion of Ms. Iravani's treating physicians, did not conduct an IME that was recommended by its own employees, and failed to take into account her age and station in life when concluding that she could reenter the workforce at the age of 61 after being out of it for over ten years.

**A.  Ms. Iravani Is Disabled Within the Meaning of the Plan**

Under the terms of the Policy as modified by Unum's settlement with the State of California, in order to be eligible for benefits under the any occupation definition of disability, Ms. Iravani must show that she is unable to perform with reasonable continuity the substantial and material acts necessary to pursue her own occupation and unable to engage with reasonable continuity in another occupation in that she could reasonably be expected to perform in light of her age, education, training, experience, station in life,  and physical and mental capacity. (AR-1 at 68); Keenley Dec., Exh. 2 at Part V.D.1 (page 13); *Cf. Moore v. American United Life Ins. Co.*, 150 Cal. App. 3d 610, 618 (Ct. App. 1984).

There is no dispute in this case that Ms. Iravani is unable to perform the substantial and material acts of her usual occupation, Unum has never asserted that she could at any point, instead repeatedly finding that she could not.  *See, e.g.,* AR-1 at 13, 403-409, 955-56.  For many years Unum also did not dispute that Ms. Iravani was unable to perform any other occupations that she could reasonably be

expected to perform because the only occupations Unum could identify as being within her skills, abilities, and experience did not pay a gainful wage.  AR-1 at 955-56.  As discussed in detail above, Unum repeatedly reviewed these findings and reaffirmed them between December 2012, which the any occupation standard of disability went into effect, and January 2021, when it ultimately decided to change positions and terminate the claim.  *See supra,* Part II.D.

### 1.   The Medical Evidence Supports a Finding that Ms. Iravani Is Disabled

The medical evidence supporting Ms. Iravani's disability is substantial:  her medical records document long-standing complaints of and treatment for chronic neck and back pain (*see e.g.,* AR-1 at 169-177, 335, 338, 524-531, 931-932; AR-2 at 1250-1290, 1429-30); she has been repeatedly diagnosed by multiple physicians with cervical and lumbar radiculopathies (AR-1 121, 184, 190- 191), and MRIs show degenerative changes at multiple levels of her spine (AR-1 at 192-193, 599).

Ms. Iravani has had five doctors across multiple specialties evaluate and treat her spinal disease and pain syndromes and all of them concluded that she is significantly impaired from performing work activities by these medical problems and certified her disability for Unum and her workers' compensation carrier.  That includes two orthopedic surgeons: Dr. Savala (AR-1 at 121, 190-92) and Dr. Sun (AR-1 at 184); two pain specialists Dr. Cheng (AR-1 at 931-932) and Dr. Lin (AR-2 at 1915-1917, AR-3 at 2674, 2686-2688); and a chiropractor, Dr. Nasiri (AR-1 at 340, 403-409, 981-998).  Multiple of Unum's in-house medical experts also concurred with Ms. Iravani's treating doctors, including Kathy Pepin, RN (AR-1 at 900-904), and Richard Maguire, M.D., an on-site physician (AR-1 at 403-409).

### 2.   The Favorable SSDI Decision Supports a Finding that Ms. Iravani Is Disabled

Administrative Law Judge John Flanagan's review of the medical evidence in rendering his favorable determination on Ms. Iravani's SSDI claim also supports a finding that Ms. Iravani is disabled. Judge Flanagan found that Ms. Iravani had "severe impairments" as a result of her spinal disease and pain syndrome, which, he concluded, "significantly limit the ability to perform basic work activities." AR-3 at 2126.  He concluded that Ms. Iravani would be "restricted to performance of simple repetitive tasks but would not be able to maintain consistent attendance," would "have difficulty interacting with supervisors, adapting to routine changes, tolerating the stress of day-to-day work activity" and, lastly,

"would not be able to attend, sustain effort, comprehend or remember work tasks without additional supervision." AR-3 at 2127.

Judge Flanagan further found that Ms. Iravani's subjective complaints of pain were highly credible and entitled to significant evidentiary weight because they were consistent with the medical evidence provided by her treating physician, Dr. Lin, and the findings of consultative experts hired by the Social Security Administration to evaluate her. AR-3 at 2129.

### 3. The Vocational Evidence Supports a Finding that Ms. Iravani Is Disabled

In addition to the medical evidence from her treating physicians and the findings of Judge Flanagan, Ms. Iravani's claim is also supported by vocational experts, including Terri Hardiman, a certified vocational rehabilitation consultant employed by Unum who concluded that while Ms. Iravani did have skills that would translate to less physically demanding sedentary occupations, those occupations were all low-wage occupations that would not constitute a "gainful occupation" within the meaning of the Policy. AR-1 at 956. And Carrie Cousins, another certified vocational rehabilitation consultant who reviewed the vocational evidence in June 2020 and who also concluded that Ms. Iravani would not be able to find gainful occupations that worked with her physical restrictions. AR-3 at 2502-03. Those findings are further supported by the testimony of Social Security's vocational expert at Ms. Iravani's hearing: Judge Flanagan found that this expert's testimony supported a finding that Ms. Iravani "would not be able to perform any type of competitive work activity" concluding that "considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform." AR-3 at 2129.

Because the objective medical evidence, the opinions of Ms. Iravani's treating physicians, the opinions of Unum's in-house medical experts, the findings of the Social Security Administration, the conclusions of three vocational experts, and Unum's actual course of conduct on this claim all support a finding that Ms. Iravani is disabled from performing her own or any other occupation, she has met her burden to prove that she is disabled within the meaning of the Policy.

**B.  Unum's Change in Position on Ms. Iravani's Claim Lacks Evidentiary Support**

The fact that Unum itself considered the medical and vocational evidence was sufficient to prove that Ms. Iravani's claim for benefits should be paid for more than ten years also supports judgment in Ms. Iravani's favor.  This long history of approving the claim must be taken into account when assessing Unum's decision to terminate the claim.  Paying benefits for a long period of time does not preclude future claim termination, "but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."  *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (1st Cir. 2002).

The evidence available to Unum in this case did not change in any significant way when Unum terminated the claim in 2021, and it certainly did not show that Ms. Iravani's medical conditions have improved in any material respect.  The facts of this case are a more extreme version of those in *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008), in which the Ninth Circuit found that it was an abuse of discretion for an insurer to abruptly change positions without a reasonable evidentiary basis for doing so.  In *Saffon*, the Ninth Circuit was confronted with the following situation: MRIs documented degenerative spinal disease, the insurance company approved the claim on the basis of the claimant's spinal disease and paid benefits for one year, and then the insurance company denied the claim without any evidence that the disabling condition had changed.  522 F.3d at 871.  The court concluded that this course of conduct demonstrated the lack of a principled reasoning process, noting that in the case of a degenerative spinal disease, one would expect a change in the insurer's position to be justified by evidence the condition had improved.  *Id.*

In *Saffon*, the claim had only been paid for a year.  *Id.*  Here, the circumstances are considerably more dramatic: Unum thought the medical evidence supported disability for ten years and has done an about face on this position based not on any evidence of improvement, but instead solely on the frequency and "intensity" (whatever that might mean) of Ms. Iravani's treatment since 2017.  More is required—specifically, actual evidence of improvement is required—to justify Unum's change in in its long-standing determination that Ms. Iravani was disabled and eligible for benefits.

1

### C.  Ms. Iravani's Age and Station in Life Make Returning to Work Impossible

2

At the time Ms. Iravani's claim was terminated she had been out of the workforce for ten years

3

and was 61 years old, factors that, even if she had miraculously recovered from her spinal disease and

4

pain syndrome so as to be physically able to work, would place significant barriers on her ability to

5

reenter the workforce.  Unum has not considered these factors at all, none of their vocational consultants

6

or medical experts address Ms. Iravani's advanced age and its effect on her ability to physically

7

recovery from work, her ability to realistically obtain employment in fields outside the retail cosmetics

8

industry, or her ability to learn new skills and techniques that would inevitably be necessary after a ten-

9

year absence from the workforce.

10

This oversight is especially egregious in the two vocational reports prepared at the end of 2020,

11

which provide an essential component of Unum's rationale for terminating Ms. Iravani's claim.  As

12

discussed in detail above these reports are patently unreliable  because the conclusions contained therein

13

are grounded in an obvious factual error: the belief that Ms. Iravani had significant retail store

14

management experience.  That factual error led the vocational consultants to conclude that Ms. Iravani

15

had a much broader range of transferable skills than her work history actually supports, which in turn led

16

to the conclusion that there are high-paying sedentary jobs she is qualified for and could obtain.

17

In addition to those analytical mistakes and faulty conclusions, Unum's vocational consultants

18

also failed entirely to take into account Ms. Iravani's age and station in life and whether she would

19

realistically be able to obtain and perform other occupations in light of these factors.  Neither consultant

20

discusses these issues at all, but this analysis is required by both the CSA and by long-standing

21

California common law.  Keenley Dec., Exh. 2 at Part V.D.1 (page 13); *Cf. Moore v. American United*

22

*Life Ins. Co.*, 150 Cal. App. 3d 610, 618 (Ct. App. 1984).

23

Clearly, at age 61, Ms. Iravani would reasonably be expected to have more difficulty with her

24

degenerative spinal disease and to be more limited by her pain than she was in her early 50s when Unum

25

found her to be disabled.  *See Mackey v. Liberty Life Assurance Company of Boston*, 168 F. Supp. 3d

26

1162, 1171 (1st Cir., 2016) (holding that it is an abuse of discretion to disregard a claimant's advanced

27

age which, is "a central factor in determining whether she is capable of performing an occupation.").

28

Moreover, having been out of work for ten years and with the last eight years of her career being spent entirely in retail cosmetic sales, Ms. Iravani obviously would be at a significant disadvantage in the labor market even if she was physically and mentally capable of working.

Unum's failure to factor in Ms. Iravani's age and station in life is a violation of the CSA and is inconsistent with the terms of the policy.  The conclusions of Unum's vocational experts in 2020 are unreliable and defy common sense as a result.  Any reasonable assessment of Ms. Iravani's age and station in life at the time her claim was denied weighs heavily in favor of continuing to approve her claim in light of her extremely limited employment prospects.

## V.     CONCLUSION

A preponderance of evidence in this case, including the opinions of all five of Ms. Iravani's treating physicians, one of Unum's in-house doctors, and multiple of Unum's in-house nurses, objective imaging studies, the opinions of two of Unum's vocational consultants and the Social Security Administration's vocational expert, the conclusions of Administrative Law Judge Flanagan with respect to Ms. Iravani's SSDI claim, and Unum's ten year course of conduct in which it repeatedly reviewed and approved the claim shows that Ms. Iravani is disabled within the meaning of the Policy. Accordingly, Plaintiff respectfully requests that the Court grant her motion and order the parties to meet and confer regarding Plaintiff's claim for attorney's fees and costs of suit, prejudgment interest, and any other matters necessary to bring the case to final judgment.

Respectfully submitted,

Dated:  August 10, 2022                              By: _/s/ *James P. Keenley*_____

James P. Keenley
Bolt Keenley Kim LLP
*Attorneys for Plaintiff*