UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHARAREH IRAVANI,

Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

Defendant.

Case No. 21-cv-09895-HSG

**ORDER GRANTING PLAINTIFF'S
MOTION FOR JUDGMENT AND
DENYING DEFENDANT'S CROSS-
MOTION FOR JUDGMENT**

Re: Dkt. Nos. 32, 33

Pending before the Court are the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52.  Dkt. Nos. 32, 33.  Plaintiff Sharareh Iravani challenges the denial of her long-term disability benefits by Defendant First Unum Life Insurance Company,[1] and brings a single claim for benefits under the Employment Retirement Income Security Act ("ERISA").  *See* Dkt. No. 1.  For the reasons detailed below, the Court **GRANTS** Plaintiff's motion for judgment and **DENIES** Defendant's motion.

## I.   LEGAL STANDARD

ERISA provides claimants with a federal cause of action to recover benefits due under an ERISA plan.  *See* 29 U.S.C. § 1132(a)(1)(B).  The parties agree that the Court may resolve Plaintiff's ERISA claim on cross-motions for judgment under Federal Rule of Civil Procedure 52.  "Under Rule 52, the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true."  *See McCulloch v. Hartford Life & Accident Ins. Co.*, No. 19-CV-07716-SI, 2020 WL 7711257, at *7 (N.D. Cal.

---

[1] Defendant notes that it was erroneously sued as Unum Life Insurance Company of America. Dkt. No. 33 at 1.  Plaintiff does not appear to dispute this, and the group insurance policy at issue also lists First Unum Life Insurance Company.  *See* Dkt. No. 30-1 at 54.

Dec. 29, 2020) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc)); *see also* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

A denial of ERISA benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) ("De novo is the default standard of review."). Here, the parties agree that the de novo standard of review applies. *See* Dkt. No. 18 ("The Parties agree that this Court shall apply a *de novo* standard of review in this case . . . ."). Under de novo review, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt, Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010). In other words, "the burden of proof is placed on the claimant," who must establish that she is entitled to benefits under the plan or policy by a preponderance of the evidence. *Id.* at 1294–96; *see also Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).

## II.   FACTUAL FINDINGS[2]

### A.   Claim History

The facts of this case are largely undisputed. From approximately 2006 to 2010, Plaintiff worked as a cosmetic beauty specialist at Saks Fifth Avenue. *See* Dkt. No. 30-1 ("AR-1") at 516, 952; Dkt. No. 30-3 ("AR-3") at 2464.[3] Plaintiff stopped working at Saks in June 2010, and submitted a claim for disability benefits under a group insurance policy issued by Defendant Unum. *See* AR-1 at 2–12. Plaintiff indicated that she was unable to continue working because of neck pain and migraine headaches. *See id.* at 11.

---

[2] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

[3] The administrative record in this case was submitted in three parts, referred throughout as AR-1, AR-2, and AR-3 respectively.

United States District Court
Northern District of California

After investigating and obtaining information from Plaintiff's doctors, Unum ultimately approved Plaintiff's claim for benefits on February 4, 2011. *See id.* at 421–30. Unum continued to approve Plaintiff's long-term disability benefits for almost a decade, with Unum generally requesting updated information from Plaintiff and her doctors annually. *See, e.g.*, Dkt. No. 33 at 9–10; AR-1 at 13, 981–98; AR-2 at 1109, 1450, 1929–30; AR-3 at 2035–36, 2049–54.

On January 7, 2021, Unum terminated Plaintiff's benefits. *See* AR-3 at 2790–2806. Unum explained that based on its determination, Plaintiff could "perform the duties of alternate gainful occupations," so she was no longer considered disabled. *Id.* at 2796–97. Specifically, Unum contended, "based on the totality of the medical evidence in the file, including the infrequency and the lack of intensity in treatment," that Plaintiff could perform "full-time sedentary or light physical demands." *Id.* at 2799–2800. This includes occupations such as "Information Sales Representative," "Hotel Sales Representative," and "Personnel Scheduler." Unum also pointed out that Plaintiff had not had any recent imaging studies to support Plaintiff's complaints, and her treatment appeared to decrease significantly over time for her low back and neck pain. *Id.* Unum noted that Plaintiff currently controlled her pain with over-the-counter medication. *Id.* at 2800. Unum also demanded payment from Plaintiff of $9,189.50 of what it called "overpaid" benefits. *See* AR-3 at 2796, 2820–21, 2898–99. Plaintiff appealed the decision, providing additional information from her doctors, but Unum ultimately denied the appeal on May 4, 2021. *See id.* at 2825–36, 2840–41, 2857–73, 2878. Plaintiff then filed this case in December 2021, alleging that Unum erroneously concluded that she was no longer disabled and entitled to benefits. Dkt. No. 1.

### B. Policy Language

The group insurance policy states in relevant part:

> [Y]ou are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

> You must be under the regular care of a physician in order to be considered disabled.

> We may require you to be examined by a physician, other medical

> practitioner and/or vocational expert of our choice.  Unum will pay for this examination.  We can require an examination as often as it is reasonable to do so.  We may also require you to be interviewed by an authorized Unum Representative.

AR-1 at 68.  "Gainful employment," in turn, is defined as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work that exceeds 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." *Id.* at 83.  Under the terms of the policy, Unum may stop benefits on:

> the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program; [or]
>
> . . .
>
> the date you fail to submit proof of continuing disability . . . .

*Id.* at 73–74.[4]

### C.   Medical History

The administrative record contains significant medical history, most of which is again undisputed.  During the hearing on the cross-motions for judgment, the parties agreed that the administrative record was sufficient on its own for the Court to resolve this case, and no further medical evaluations were needed.  The Court highlights the salient pieces of the record.

Beginning in 2009, Plaintiff complained of increasingly severe pain in her neck and upper back, as well as migraine headaches.  *See* AR-1 at 152, 187–88.  At the time, she was taking Maxalt for her migraines and ibuprofen for the pain, and Edward C. Sun, M.D., an orthopedic

---

[4] The Court **DENIES** Plaintiff's request that the Court take judicial notice of prior cases and a settlement with the State of California involving related Unum entities and their claims practices. *See* Dkt. No. 32 at 3, & Exs. 1–2.  Plaintiff appears to suggest that because Unum Life Insurance Company of America has previously been found to erroneously deny benefits, Defendant First Unum Life Insurance Company must have done so here.  Yet Plaintiff provides no explanation why such extrapolation is warranted here.  These are separate entities, and any terms of the California settlement agreement do not apply here.  The Court therefore only considers the language of the insurance policy when determining whether Plaintiff has met her burden of establishing that she is entitled to benefits.

surgeon, recommended she get an MRI.  *Id.* at 187–88.  In January 2010, Plaintiff had an MRI of her cervical spine.  AR-1 at 186, 192–93.  Following the MRI, another orthopedic surgeon, Robert Savala, M.D., conducted a physical examination and reviewed the MRI results.  *See id.* at 189–91. He explained that the MRI showed "disc degenerative changes and straightening of the cervical spine" and "disc protrusion/herniation producing mild central stenosis and foraminal stenosis."  *Id.* at 190.  The MRI also indicated "a loss of disc height and disc bulging and steophyte findings and central stenosis."  *Id.*  He diagnosed Plaintiff with cervicalgia; bilateral upper extremity C6 radiculopathy; cervical spondylosis at C5-C6 and C6-C7; cervical spinal stenosis at C5-C6; and C6-C7.  *See id.*

Based on these findings, Dr. Savala recommended that Plaintiff get an epidural steroid injection, and believed she was a possible candidate for surgery but indicated she should consult again with Dr. Sun.  *See id.* at 190–91.  In June 2010, Dr. Savala gave Plaintiff the steroid injection, and recommended that she stay off work until at least July 15, 2010.  *See id.* at 121–24, 371–72.  At the time, he concluded that Plaintiff could still sit, stand, and walk frequently, but could only occasionally reach above shoulder level, and could never twist, bend, stoop, or lift anything over 20 pounds.  *See id.* 121.  Two weeks later, Plaintiff was seen by Dr. Sun, who concluded that the injection had resulted in only "minimal improvement of her neck pain."  *Id.* at 184.  Dr. Sun concluded that Plaintiff had "[m]ultilevel cervical spondylosis, C5 to C7, with moderate canal stenosis."  *Id.* at 184, 186.  He indicated that Plaintiff should start physical therapy, and agreed with Dr. Savala that she should remain off work until at least July 15, 2010.  *Id.* at 184. He said he would see her "on an as needed basis."  *Id.*  Plaintiff attended multiple physical therapy sessions in July 2010.  *Id.* at 169–177, 185.

In August 2010, Plaintiff saw Stephen Pratt, M.D., and indicated that she was not experiencing relief from the physical therapy.  *See id.* at 209–10.  She continued to take Maxalt for her migraines and ibuprofen.  *Id.*  Dr. Pratt concluded that Plaintiff had "[c]ervical radiculophy [n]ow with signs of possible neurologic compromise . . . ."  *Id.* at 210.  He further noted that "exam is difficult due to pain," and that "conservative measures" were "failing."  *Id.*  Dr. Pratt advised Plaintiff to stay off work, and to consult with a spine surgeon.  *Id.*  He also gave her a trial

of stronger migraine medication. *Id.*  She also returned to Dr. Sun in late August, noting that her pain had increased in intensity, and she rated it a 7 to 8 out of 10. *Id.* at 213.  Dr. Sun said that because her neurologic exam remained stable, he was comfortable continuing nonsurgical options. *Id.*  He recommended that Plaintiff continue an at-home exercise plan and anti-inflammatory medication, treatment which he stated was "reasonable." *Id.*  He further stated that spinal surgery could be considered "as an option of last resort" if her pain persisted. *Id.*

From August 2010 through January 2011, Plaintiff also saw a chiropractor, Massoud Nassiri, D.C. *See id.* at 335–50, 432–39.  Based on his physical examinations and treatment, Dr. Nassiri diagnosed Plaintiff with, *inter alia*, cervical disc syndrome, radicular neuralgia, cervical sprain, thoracic sprain/strain, lumbar sprain/strain, and segmental dysfunction along her spine. *Id.* at 339, 347.  He also identified new restrictions in Plaintiff's ability to sit, stand, and walk. *See id.* at 337–39, 348.  He concluded that Plaintiff could only return to work with significant accommodations:  no more than 4–6 hours of work per day; no lifting, pushing or pulling over 5–8 pounds; no bending, stooping, or climbing more than 8–10 times per hour; no squatting or kneeling; and no firm grasping or repeated use of hands. *Id.* at 340.

In February 2011, one of Unum's physicians, Richard Maguire, M.D., reviewed Plaintiff's medical records and noted that the medical records supported her cervical spine and migraine symptoms. *See id.* at 407.  Dr. Maguire further noted that Plaintiff had tried "multiple treatment modalities to relieve her pain," but they did not provide her with relief. *Id.*  He also explained that the medical record supported her inability to perform light work, and that such restrictions were not compatible with the physical demands of her occupation. *Id.* at 408–09.  Plaintiff was informed shortly thereafter that Unum had granted her request for disability benefits. *See id.* at 421–30.

Plaintiff had another MRI of her lumbar spine in June 2011. *See id.* at 599.  Plaintiff was evaluated by Ernest Cheng, D.O. *See id.* at 577–89, 599.  Based on the MRI and his physical examination, Dr. Cheng concluded that Plaintiff was suffering from chronic bilateral cervical radiculopathy; chronic bilateral lumbar radiculopathy; cervical disc herniation/spinal stenosis; and lumbar degenerative disc disease. *Id.* at 580.  He further concluded that she had "reached maximal

medical improvement for the cervical spine," but not for her lower back. *Id.* at 580–81. He noted that Plaintiff was taking ibuprofen three to four times daily for pain control, but that he did not recommend "consistent long-term use of oral NSAIDs" such as ibuprofen and Advil. *See id.* at 577, 580. Instead, he recommended a reevaluation of her pain medication regimen by her primary physician or a chronic pain management specialist. *Id.* at 580. Dr. Cheng also identified specific work restrictions: Plaintiff should not lift, push, or pull greater than ten pounds, or kneel, crawl, stoop, or squat; she should attempt to avoid "repetitive flexion/extension of the neck or turning of the head" and repetitive bending at the waist; and she required a five-minute break for every 60-minutes of repetitive activity involving her upper limbs. *Id.* at 581.

Plaintiff continued to have monthly appointments with Dr. Nassiri through 2011 and part of 2012, during which Dr. Nassiri noted frequent "flare ups of her symptoms." *See id.* at 524–31, 542, 642–649, 656–61, 663–99, 737–54, 782–90, 798, 824–32, 907–18.

In March 2012, Dr. Cheng evaluated Plaintiff again. *Id.* at 925–33. After a review of her medical records and a physical examination, he confirmed his prior findings that Plaintiff was suffering from chronic bilateral lumbar radiculopathy. *Id.* at 931. Dr. Cheng explained that Plaintiff's "[t]reatment to date had been appropriate," and that she had "reached maximum medical improvement in regard to her lumbar spine" as well. *Id.* He didn't believe her condition would improve or worsen over the next 12 months, but recommended "physician office visits" as well as "pain medication and injections." *Id.* at 932. He also said an evaluation by an orthopedic spine surgeon or neurosurgeon may be appropriate in future if her symptoms worsened. *Id.* A few months later, in July 2012, Dr. Nassiri evaluated Plaintiff and agreed with Dr. Cheng that Plaintiff had reached maximum medical improvement of her orthopedic injuries, and that she nonetheless remained disabled due to her permanent restrictions. *Id.* at 981–98.

In April 2012, an Unum in-house nurse, Kathy Pepin, R.N., reviewed Plaintiff's medical records. *See* AR-1 at 900–04. She concluded in a clinical review that Plaintiff's medical records "support that [Plaintiff] has continued to have appropriate treatment for her pain . . . and that there is adequate information to assess the existence, intensity frequency, and duration of . . . the reported cervical spine symptoms." AR-1 at 903–04. Ms. Pepin stated that Plaintiff's

United States District Court
Northern District of California

1    "[p]rognosis for increased functional demand is poor based on lack of improvement even with

2    extensive care." *Id.* at 904.

3         Later in 2012, Plaintiff began treatment with Eduardo Lin, M.D., a pain specialist.  *See*

4    AR-2 at 1349–50, 1352–58.  He initially explained that she was "quite dysfunctional with chronic

5    pain and discomfort." *See, e.g.*, *id.* at 1356.  He noted that she had "decreased cervical and lumbar

6    spine range of motion" and "[m]yofacial trigger points in cervical and lumbar paraspinal

7    musculature." *Id.* at 1349.  He indicated that she suffered from cervical sprain/strain; lumbosacral

8    sprain/strain, possible cervical and lumbar disc injury lumbosacral radiculopathy, and myofascial

9    pain syndrome.  *Id.*  He recommended increasing her current treatment of Maxalt for her migraine

10   headaches and Tylenol for her pain, because they were not sufficient to control her increased pain

11   and discomfort.  *Id.*  In 2012 and early 2013, Dr. Lin also recommended the use of nortriptyline at

12   night for pain control and Flexeril for muscle spasms.  *Id.* at 1250, 1254–56, 1262, 1345.  Plaintiff

13   continued to see Dr. Lin approximately every six weeks through 2013.  *See id.* at 1250–90, 1359–

14   60.

15        Dr. Lin referred to Plaintiff as having "chronic disabling musculoskeletal condition

16   disorder," and noted that she described her pain at times as "unbearable." *Id.* at 1255–56.  He

17   recommended that Plaintiff be evaluated for a Functional Restoration Program ("FRP") to help

18   "improve her function, coping skills, and better manage her pain and discomfort." *See, e.g.*, *id.* at

19   1256.  Such programs "incorporate[e] components of exercise progression with disability

20   management and psychosocial intervention." *Id.* at 1272.  Dr. Lin also "encouraged [Plaintiff] to

21   do exercises at no pain range and to apply modality treatment for pain control on an as needed

22   basis." *See id.* at 1268.  And he continued to list pain medication like ibuprofen for her pain.  *See,*

23   *e.g.*, *id.* at 1253, 1267–68, 1271–72, 1274–76, 1281, 1285–86, 1361–62.  In approximately June

24   2013, Plaintiff was evaluated for FRP, and she was initially recommended "for treatment with

25   living accommodations," but it was determined she lived too far away and her insurance would

26   not cover it.  *See, e.g.*, *id.* at 1272, 1360, 1396.

27        In evaluating Plaintiff's ability to work, Dr. Lin found significant restrictions due to her

28   chronic pain.  *See id.* at 1278.  For example, she could not lift, push, or pull anything over ten

United States District Court
Northern District of California

United States District Court
Northern District of California

pounds or sit or stand for more than 20 minutes at a time; she could not kneel, crawl, or reach above her shoulder; and she should avoid stairs and any repetitive motions of her hands. *Id.*

In March 2014, Plaintiff was evaluated by another pain specialist, Dennis Yun, M.D. *See id.* at 1424–31. She complained of constant pain, which she described as "moderate to severe in intensity," or on a scale of 0 to 10, a "7 at its best and 10 at its worst." *Id.* at 1425. Dr. Yun confirmed that Plaintiff had cervical and lumbar radiculopathy. *Id.* at 1429. He requested "continued conservative management" for her pain, and recommended she continue with her current medications. *Id.* at 1429–30.

Plaintiff then returned to Dr. Lin for her neck and back pain periodically in 2015 and 2016. In October 2015, she told Dr. Lin that she was using ibuprofen for her pain. *See* AR-2 at 1871–83. She described her current neck pain as a 6 out of 10 and her back pain as an 8 out of 10. *Id.* at 1872. Dr. Lin noted Plaintiff's prior treatments, such as medication, physical therapy, injections, acupuncture, and chiropractic care, but noted she received only temporary benefits. *Id.* He recommended at-home exercises, chiropractic treatments for four weeks, and a back brace. *Id.* at 1873. Later in April 2016, Dr. Lin indicated that Plaintiff "still ha[d] pain and discomfort." *Id.* at 1892. He recommended that she use Motrin, Prilosec, and Effexor XR for her pain control. *Id.* Plaintiff returned in May, asking for additional treatment. *Id.* at 1895. In addition to her current medications, Dr. Lin requested approval for electro-acupuncture treatment. *Id.* at 1895–96. The following month, in June 2016, Dr. Lin concluded that Plaintiff was disabled by her pain with significant restrictions of no pushing, pulling, or lifting greater than 10 pounds, no sitting longer than 20 minutes, and no repetitive work movements with her upper extremities. *See id.* at 1915–17.

In July 2016, Unum confirmed that based on its review of Plaintiff's prior medical history, particularly her 2014 visit to Dr. Yun, that there was no change in Plaintiff's reported pain complaints or level of impairment. *See id.* at 1923–25, 1927–30. In its cross-motion, Unum suggests that by June 2017, Dr. Lin suggested Plaintiff's condition had improved and she could return to work by January 2018. *See* Dkt. No. 33 at 10 (citing AR-3 at 2046). This is not supported by the record. In June 2017, Dr. Lin filled out a "Request for Medical Information"

form for Plaintiff's California disability insurance. *See* AR-3 at 2045–46. Dr. Lin continued to find lumbar range of motion decreased and lumbar and cervical tenderness. *Id.* at 2045. He noted that Plaintiff receives acupuncture, cortisone injections, and physical therapy. *Id.* Dr. Lin also continued to find that she was incapable of performing her normal work. *Id.* Although Dr. Lin included January 5, 2018, as an approximate date by which Plaintiff's "disability (if any) should end or has ended sufficiently to permit [her] to resume regular or customary work," the form explicitly required him to select some estimated return-to-work date, "[e]ven if considerable question exists." *Id.* at 2046. The form precluded him from stating that the date she could return to work was "indefinite" or that he didn't know when she would be able to return. *Id.*

And again in 2017, an Unum claim analyst, Kassandra Perrone, performed an annual review and concluded based on the prior medical records and a conversation with Plaintiff that her diagnoses and symptoms "have not gotten any better in the past year," and "remained consistent with no improvement in functional capacity." *See* AR-3 at 2053–54. Unum also referred Plaintiff to Genex Services, LLC, a vendor who would help Plaintiff pursue possible social security disability benefits based on her condition. *See* AR-2 at 1846, 1945, 1947–50, 1963–67; *see also* AR-3 at 2133.

Genex requested a hearing before an administrative law judge in Plaintiff's social security case. *See* AR-2 at 1970. Plaintiff appeared for a hearing before Judge John J. Flanagan in February 2018. *See* AR-3 at 2124. At the hearing, Plaintiff testified that her children must help her with most of her daily activities, and she spends most of the day laying down to control the pain. *See id.* at 2129. Judge Flanagan found her complaints credible and well supported by the medical evidence. *Id.* Following the hearing, Plaintiff was also evaluated by an orthopedic surgeon, Dr. Omar Bayne, M.D., and a clinical psychologist, Dr. Deepa Abraham, Ph.D. *See id.* at 2124. Judge Flanagan ultimately determined that Plaintiff was entitled to social security disability benefits. *See id.* at 2124–30.

As required under the Social Security Act, he considered whether Plaintiff was unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that . . . can be expected to last for a

United States District Court
Northern District of California

continuous period of not less than 12 months." *Id.* Based on the medical record and Plaintiff's own testimony, Judge Flanagan found that Plaintiff suffered from several severe impairments, including "[p]hysically chronic neck strain/sprain, bilateral cervical radiculopathies, chronic low back strain/sprain, bilateral lumbar radiculopathies, left frozen shoulder, and [a] history of myofascial pain syndrome." *Id.* at 2126, 2128. He concluded that these impairments "significantly limit [her] ability to perform basic work activities." *Id.* He went on to find that Plaintiff could only sit for 6 out of 8 hours, stand for 4 out of 8 hours, and would require a "sit/stand option every 30 minutes to control her pain." *Id.* at 2127. She was entirely precluded from "all postural activities such as bending, twisting, crouching, crawling, stooping, kneeling, climbing up and down stairs, inclines, ramps and ladders . . . ." *Id.* She also could not "reach[] and work[] with the left hand above shoulder level." *Id.* He indicated that she should be "restricted to performance of simple repetitive tasks but would not be able to maintain consistent attendance," would "have difficulty interacting with supervisors, adapting to routine changes, tolerating the stress of day-to-day work activity" and, lastly, "would not be able to attend, sustain effort, comprehend or remember work tasks without additional supervision." *Id.*

In August 2019, Plaintiff saw Muniza Muzaffar, M.D., for a shoulder injury after she fell in her kitchen. *See* AR-3 at 2492–97. Dr. Muzaffar's notes indicated that she had a history of "chronic low back pain" and migraines, and listed these issues as "active problem[s]." *Id.* at 2492–93. Shortly thereafter, in October 2019, Plaintiff reported to Unum that she had lost her healthcare insurance, so was not being seen by any doctors. *See id.* at 2249–64. But she continued to take Tylenol and Excedrin. *See id.* at 2249. When speaking to Unum at the end of December 2019, Plaintiff explained that she still did not have insurance but was in the process of signing up for Medicare. *See id.* at 2313–14. She said her conditions—and pain—remained unchanged, and she continued to have neck and back pain. *Id.* at 2313. She also explained that she continued to rely on her children to help her with daily tasks. *Id.* She reported constantly changing her position, and noted that getting out of the house was difficult. *Id.* at 2313–14.

At the beginning of 2020, Plaintiff established care with Eena Duggal, M.D., who saw her for a new patient visit and annual wellness exam in January. *See id.* at 2381–2399. At the time,

11

Dr. Duggal did not ask Plaintiff about her daily activities or back care.  *See id.* at 2384.  She did, however, still note Plaintiff's chronic low back and neck pain.  *See id.* at 2385, 2389, 2392–93. Dr. Duggal saw her again in May for another wellness appointment, focused on "screening and prevention."  *See id.* at 2523–37, 2546.  Plaintiff's chronic low back and neck pain were listed as active problems, but Plaintiff did not seek care from Dr. Duggal for these conditions during that appointment.  *Id.* at 2532–33.  Plaintiff noted that she continued to take Tylenol and Excedrin, but did not need help with the activities of daily living.  *Id.* at 2526, 2531, 2539.  Plaintiff had a follow-up appointment with Dr. Duggal to discuss abnormal lab results, unrelated to her back and neck pain.  *See id.* at 2568–2604.  Plaintiff again noted that she was taking Tylenol for her back pain and Excedrin for her migraines  *See id.* at 2578.  In June 2020, Plaintiff indicated that she was asked to stop taking Tylenol because she was having liver issues as a result.  *See id.* at 2630–31.

Plaintiff returned to Dr. Lin in August 2020.  *See id.* at 2686–88.  In his progress report, Dr. Lin found that Plaintiff's condition was either the same or worse than before.  *Id.* at 2686. Plaintiff continued to complain of neck and low back pain, ranging between 6 and 9 on a scale of 0 to 10.  He found that her range of motion had decreased and she had local muscle spasms.  *Id.*  As before, Dr. Lin found that Plaintiff could not lift, push, or pull over 10 pounds and could only occasionally reach over her shoulder.  *Id.* at 2674.  The next month, Plaintiff also saw James Rhee, M.D., for the first time as a specialist for her neck and back pain.  *Id.* at 2756, 2759.  In December 2020, Unum asked Dr. Rhee if he could opine on any functional restrictions that Plaintiff had, but his office explained that at that time he had only seen Plaintiff once and had not reviewed the rest of her medical records, including her prior MRIs.  *See id.* at 2756, 2762.  For her part, Plaintiff continued to explain to Unum that her neck and back pain were the same, she lived with her son who helped care for her, and rarely left the house.  *Id.* at 2756–57.

Then, at the end of 2020, Unum's in-house physicians conducted a review of Plaintiff's information on file.  *See id.* at 2720–26.  Stewart Russell, M.D., did not speak directly with Plaintiff or any of her providers, but nonetheless opined that he did not believe any functional restrictions were warranted based on Plaintiff's medical records.  *Id.*  Dr. Russell pointed out that since 2017 Plaintiff was only taking Tylenol, which he believed was insufficient to support a

claim of pain severe enough to prevent Plaintiff from working.  *See id.* at 2724.  Similarly, he thought that taking Excedrin for migraine headaches was insufficient to support a finding that her migraines caused any impairment.  *Id.* at 2725.  Dr. Russell also noted that Plaintiff had not received any recent imaging studies.  *Id.* at 2724–75.  Although he acknowledged that Plaintiff received social security disability benefits, he did not address any of the specific diagnoses or limitations Judge Flanagan found based on the medical record before him.  *See, e.g.*, *id.* at 2723, 2725–76.  Dr. Russell also discounted the treating physicians' prior opinions, stating that they were not supported by physical findings.  *Id.*  Dr. Russell did not, however, suggest what sort of physical findings he would find sufficient.  In short, Dr. Russell simply suggested that Plaintiff's care had been too conservative to support any functional limitations.  He therefore concluded that she could exert up to 20 pounds of force occasionally and 10 pounds of force frequently; stand and walk frequently during the workday; and frequently work with her hands and lift them in any direction.  *Id.* at 2725; *see also id.* at 2732–33.  Shortly thereafter, another Unum medical officer, James Lewis, M.D., reviewed and agreed with Dr. Russell's opinion for the same reasons.  *See id.* at 2729–31.

Notwithstanding the stated opinions of Dr. Russell and Dr. Lewis, in December 2020 one of Unum's own claim analysts said that she was "unable to support a non-compensable determination" for Plaintiff's benefits claim because the Unum doctors had not given sufficient weight to Judge Flanagan's social security disability findings.  *See* AR-3 at 2738–40.  She recommended further review.  *See id.* at 2739.  A few days later, a "[f]orum" of Unum employees convened, and concluded that an independent medical examination ("IME") was needed to assess Plaintiff's current functional capacity.  *See id.* at 2744–46.  However, Unum never asked Plaintiff to undergo this IME.

In March 2021, in response to letters from Unum, Dr. Lin again confirmed that Plaintiff had chronic pain, and as a result had difficulty sitting for any prolonged period of time.  *Id.* at 2825–28.  Although he did not conduct another physical examination of Plaintiff at that time, he explicitly disagreed with Unum's finding that Plaintiff was capable of meeting the demands of light physical work in light of her conditions.  *Id.* at 2828.  Unum had another consulting doctor

United States District Court
Northern District of California

review Plaintiff's claim, and Chris Bartlett, M.D., agreed with Dr. Russell that Plaintiff did not have any functional limitations that precluded her from sedentary work. *See id.* at 2857–62.

### D.   Vocational History

During the decade that Unum paid Plaintiff's long-term disability benefits, Plaintiff provided consistent information about her vocational history. She went to design school in Iran, and got a license to teach tailoring. *See* AR-1 at 517, 521. From 1997 to 2022, Plaintiff worked as a "fitter" and "beauty adviser" at Saks Fifth Avenue. *See id.* at 953. In this role, she would make alterations to and iron customers' clothing. *Id.* But from 2002 until 2010, Plaintiff was primarily responsible for selling beauty products at various locations.

From 2002 to 2004, Plaintiff worked as a business manager for the Clarins counter, a beauty vendor, at Nordstrom. *See id.* at 517, 952. She would make sales directly with clients; organize the stock room and display products; coordinate store events; and help plan team members' daily sales goals. *Id.* at 517. She worked directly for Clarins as a beauty instructor from 2004 to 2006. *See id.* at 516, 518, 952, 954. Plaintiff indicated that in this role she was responsible for sales of Clarins beauty products across multiple stores, and similar to her other roles, she would help the team reach their daily sales goals; would provide facials to clients; and would help train new hires. *Id.* When asked what training she used for this job, Plaintiff listed "beauty products." *See id.* at 952.

As a cosmetic beauty specialist at Saks Fifth Avenue from 2006 to 2010, Plaintiff was still primarily responsible for selling beauty products. *See* AR-1 at 270, 383–84, 952. She also was responsible for developing client relationships; consulting and applying the beauty products; coordinating department and store events; and liaising between the cosmetic department and vendor representatives. *Id.* at 270. Plaintiff also had to have basic computer skills. *Id.* Unum's vocational expert indicated that this job is described as "light work," and requires exerting up to 20 pounds of force occasionally and up to 10 pounds of force frequently; frequent standing and walking through the workday; as well as frequent reaching and handling. *Id.* at 384–85.

In 2012, Unum considered whether Plaintiff had the skills for alternative sedentary

United States District Court
Northern District of California

1    occupations that would provide a gainful wage.[5]  *See id.* at 955–56.  In 2012, Unum's vocational

2    expert, Terri Hardiman, concluded that Plaintiff's work history was in cosmetic retail sales, and

3    she had several skills, including soliciting orders, customer service, using the computer, and

4    ordering stock, that could transfer to other occupations that would only require Plaintiff to be

5    sedentary.  *See id.* at 956.  These included an inside salesclerk, a call center representative, a

6    general clerk, a clerical assistant, a receptionist, a credit clerk, and a data entry clerk.  *See id.*

7    However, Ms. Hardiman explained that none of these jobs would meet the gainful wage

8    requirement.  *See id.* at 955–56.  In June 2020, Carrie Cousins, another Unum vocational expert,

9    similarly concluded that Plaintiff had experience as a cosmetic sales representative and as a retail

10   supervisor, but that less demanding occupations for which Plaintiff might be qualified would not

11   yield a gainful wage.  *See* AR-3 at 2502–03.

12        In December 2020, Unum had yet another vocational expert, Norma Parras-Potenzo,

13   evaluate Plaintiff's file.  For the first time, Ms. Parras-Potenzo concluded that Plaintiff had

14   "supervisory and managerial experience" that would allow her to perform a gainful occupation

15   under the terms of the insurance policy.  *See* AR-3 at 2747–50.  Ms. Parras-Potenzo disagreed

16   with the prior vocational experts, explaining that they did not "accurately outline the insured's

17   vocational profile nor consider the insured's reported experience and skills in personnel

18   interviewing, training, management, event planning, including 8+ years' experience in sales that

19   directly transfer to other industries."  *Id.* at 2750.  Although the prior vocational experts reviewed

20   the exact same materials, Ms. Parras-Potenzo interpreted them differently.  She referred Plaintiff's

21   case for a "formal" vocational assessment in light of Plaintiff's limitations.  *Id.*

22        A few days later, a fourth Unum vocational expert, Amanda Morosy, concluded that

23   Plaintiff could be an Inside Sales Representative, Hotel Sales Representative, and Personnel

24   Scheduler.  *See id.* at 2753–55.  She further concluded that all three positions would meet the

25   gainful wage requirement.  *See id.* at 2755.  As Unum confirmed during the hearing on the cross-

26

27   ───────────────

28   [5] As noted in Section II.B above, "gainful employment" is defined in the policy as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work that exceeds . . . 60% of your indexed monthly earnings, if you are not working."  AR-1 at 83.

United States District Court
Northern District of California

motions for summary judgment, Unum did not have any new information about Plaintiff's vocational history in 2020. Rather, Unum stated that Ms. Parras-Potenzo and Ms. Morosy re-interpreted Plaintiff's work history with Clarins. Unum did not, however, solicit any additional information or clarification from Plaintiff about her experience.

## III.   CONCLUSIONS OF LAW

The parties appear to agree that under the policy, Plaintiff must establish by a preponderance of the evidence that (1) she has a sickness or injury that (2) prevents her from performing the duties of any gainful occupation to which (3) Plaintiff is reasonably fitted by education, training, or experience, and (4) Plaintiff is under the regular care of a physician. *See* AR-1 at 68. Unum contends that Plaintiff has not provided sufficient evidence that as of January 8, 2021, when it denied her long-term disability benefits, she had a medical condition that prevented her from performing a gainful occupation. *See generally* Dkt. No. 33. The Court finds that there is sufficient evidence to establish by a preponderance of the evidence that Plaintiff was disabled and entitled to benefits under the policy even in January 2021, at the time that Unum denied her benefits.

### A.   Medical Condition(s)

Unum urges that Plaintiff cannot establish that she has a disabling medical condition because her neck pain, back pain, and migraines actually improved and stabilized beginning as early as 2019. *See* Dkt. No. 33 at 19–22. The Court is not persuaded.

There is no evidence in the record that any of Plaintiff's treating physicians ever concluded that Plaintiff's back or neck pain improved. Rather, her doctors have consistently found that Plaintiff's pain stems from degenerative spinal problems, as confirmed by two MRIs, and that she has ongoing migraines. Since 2010, seven different physicians have diagnosed Plaintiff with cervical and lumbar radiculopathies and spinal stenosis. *See, e.g.*, AR-1 121–23, 184–86, 189–91, 210, 335–39, 343–50, 577–82, 925–33; AR-2 at 1349–50, 1424–31; AR-3 at 2686–88. Several of Unum's own doctors and nurses reviewed Plaintiff's records and found sufficient evidence to support these conclusions. *See* AR-1 at 407, 900–04.

Most recently on August 31, 2020, Dr. Lin saw Plaintiff for an office visit, and continued

United States District Court
Northern District of California

to find that Plaintiff had lumbar and cervical sprain/strain and disc injury.  *See* AR-3 at 2686–88.
Unum suggests that this opinion is somehow deficient because Dr. Lin did not check a box that
said he had reviewed Plaintiff's records, *see id.* at 2686, but the Court does not find this
conclusive.  Plaintiff had been seeing Dr. Lin periodically since 2012, and his progress notes
indicate that he believed her condition had worsened or stayed the same.  *See id.*  The more
reasonable interpretation, therefore, is that Dr. Lin drew on his prior knowledge of Plaintiff, her
condition, and her medical records.  Plaintiff's two MRIs—taken in 2010 and 2011—also support
her physicians' findings, showing degenerative changes at multiple levels of her spine.  *See* AR-1
at 192–93, 599.  By as early as 2012, two of Plaintiff's doctors had concluded that Plaintiff had
"reached maximum medical improvement" for her cervical and lumbar spine.  *See id.* at 580–81,
930–31, 981–98.

Unum does not address this conclusion at all.  Nor does Unum explain how a degenerative
condition would improve over time, particularly in light of Plaintiff's advanced age (61 at the time
Unum terminated her benefits).  Instead, Unum points to the conservative nature of Plaintiff's
treatment beginning in approximately 2019.  *See* Dkt. No. 33 at 11–13, 19–22.  Unum points out:

- Plaintiff has not had any X-rays or additional MRIs since 2011.  *See* Dkt. No. 33 at 1, 14, 17.

- By 2019, the frequency of Plaintiff's appointments "had decreased significantly." *See id.* at 11.  She did not see Dr. Lin from approximately June 2017 until August 2020.  *Id.*

- In 2019, Plaintiff saw Dr. Muzaffar when she tripped over a box in her kitchen and injured her shoulder.  *See id.* at 11; AR-3 at 2492–97.  But Plaintiff's neck and back were not assessed at that time.  *Id.*

- By 2020, Plaintiff was only taking over-the-counter medications like Tylenol and Excedrin to treat her pain and migraines.  *See* Dkt. No. 33 at 1, 14, 17, 19; *see also* AR-3 at 2526, 2531, 2539, 2578, 2724–75, 2731.

- When she visited her primary care physician in 2020, Dr. Duggal did not identify any findings of neurological deficits, muscle atrophy, or muscle weakness.  *See*

Dkt. No. 33 at 1, 17; *see also* AR-3 at 2388–89, 2393.  Although Plaintiff complained of neck and back pain, she did not seek any specific treatment for her pain at that time either.  *See* AR-3 at 2381–2399.

- Two of Plaintiff's recent treating physicians. Dr. Duggal and Dr. Rhee, did not fill out disability paperwork for Unum that would have detailed the nature of Plaintiff's functional restrictions (if any).  *See* Dkt. No. 33 at 12–13, 19; *see also* AR-3 at 2667, 2770–71, 2756, 2762.

Unum's arguments track the opinions given by Dr. Russell, Dr. Lewis, and Dr. Bartlett. *See* AR-3 at 2720–26, 2729–31, 2857–62.  Although these doctors did not explicitly conclude that Plaintiff's condition improved, they suggested that there was a dearth of evidence to substantiate Plaintiff's claims of disabling pain.  *See id.*  But critically, the doctors' conclusions and Unum's argument fail to situate Plaintiff's treatment in the broader context of her medical care.  Unum suggests that the only relevant medical records are those from 2019 onward, *see* Dkt. No. 33 at 19, but the Court disagrees with this myopic view.  Plaintiff's historical medical records are still relevant to her current condition.  And throughout the time Unum paid Plaintiff's benefits—and agreed that she was disabled—Plaintiff's treatment was conservative.

Plaintiff's doctors expressly recommended conservative treatment as appropriate for her conditions.  In 2013, for example, Dr. Lin recommended that Plaintiff perform at-home exercises "at no pain range," and to use treatment for pain control "on an as needed basis."  *See* AR-2 at 1364.  Similarly, in 2014, Dr. Yun recommended that Plaintiff continue "conservative management" for her neck and back pain, and did not recommend any new treatment plan.  *See*, *e.g.*, AR-2 at 1425, 1429–30.  Again in 2015, Dr. Lin recommended at-home exercises, chiropractic treatments for four weeks, and a back brace.  *Id.* at 1873.  Plaintiff had a single steroid injection in 2010, but saw only "minimal improvement" as a result.  *See* AR-1 at 121–24, 184, 371–72.  She went to several physical therapy sessions in 2010, but reported that she was not experiencing relief from these sessions.  *See id.* at 209–10.

One of Unum's reviewing doctors, Dr. Maguire, agreed that Plaintiff had "attempted

18

1    multiple treatment modalities to relief her pain without relief including physical therapy, epidural

2    steroid injection, and [] chiropractic care." *See* AR-1 at 407.  Yet neither Plaintiff's doctors nor

3    Unum ever before suggested that this treatment plan somehow undermined the veracity of

4    Plaintiff's claims or the severity of her conditions.

5          Still, Unum urges that the infrequency of Plaintiff's doctors' visits beginning in 2019

6    supports its conclusion that her condition improved over time.  Unum points out that Plaintiff did

7    not see a doctor in 2019 for her neck or back pain at all.  Yet there is no evidence in the record that

8    Plaintiff was somehow ignoring the recommendations of her treating physicians.  Moreover,

9    Plaintiff previously had gone some time without frequent appointments.  From November 2013 to

10   March 2014, for example, there are no records indicating that Plaintiff saw a physician for her

11   neck and back pain.  *See, e.g.*, AR-2 at 1359–60, 1414, 1424–31.  Similarly, the parties do not cite

12   to any medical records or appointments that Plaintiff had from June 2016 to July 2017, and the

13   Court was unable to locate any in the administrative record.  *See id.* at 1915–16; AR-3 at 2269.

14         Again, neither Plaintiff's physicians nor Unum suggested that there was any problem based

15   on the frequency of Plaintiff's visits at that time.  To the contrary, in both August and September

16   2017, claim analysts found that Unum had the information it required and concluded that based on

17   Plaintiff's prior medical history and her own subjective reports, her diagnoses and symptoms still

18   "remained consistent with no improvement in functional capacity."  *See* AR-3 at 2049, 2053–54.

19   That the frequency of Plaintiff's doctor's visits may have changed over time is also neither

20   surprising nor problematic, given that she had tried multiple interventions with little relief, and her

21   doctors had already concluded that she had reached maximum medical improvement years

22   earlier.[6]  Unum's suggestion that her lack of more intense treatment somehow necessarily means

23   her condition had meaningfully improved simply is not supported by the record.

24         Dr. Russell, Dr. Lewis, and Dr. Bartlett's conclusions in 2020 and 2021 also rely heavily

25   on the fact that Plaintiff was not taking prescription medication for her pain in 2020.  *See id.* at

26

27   _____

28   [6] The Court further notes that even if there was some delay in returning to a physician to treat her
     neck and back pain specialist, this delay appears explained by Plaintiff's loss of insurance
     coverage in 2019.  *See id.* at 2251, 2277.

United States District Court
Northern District of California

1    2720–26, 2729–31, 2857–62.  Dr. Russell noted that "[t]he only pain medication she appears to be

2    taking is Tylenol, which in my opinion, is insufficient to support pain of such severity that she

3    cannot perform full-time employment."  *Id.* at 2724.  Similarly, he noted that the only medication

4    she is currently taking for her migraines is Excedrin Migraine, and "[i]n my opinion, the level of

5    treatment is not consistent with severity of the headache and is not likely to produce impairment."

6    *Id.* at 2725.  Dr. Lewis and Dr. Bartlett recited Dr. Russell's opinions almost verbatim regarding

7    the intensity of Plaintiff's pain medication.  *See id.* at 2731, 2860.  The Court is not persuaded by

8    their reasoning.

9         Plaintiff had previously taken both Tylenol and Motrin (ibuprofen) for her pain.

10    Beginning as early as 2010, Dr. Mirza prescribed Motrin 800 mg for Plaintiff's back and neck

11    pain.  *See* AR-1 at 454–60.  In 2011, months after Unum had approved her claim, she similarly

12    reported taking over-the-counter ibuprofen and Tylenol.  *See id.* at 704.  In 2012, Plaintiff

13    explained to Dr. Cheng that she took Tylenol, Advil, and ibuprofen for her pain.  *See id.* at 930.

14    Dr. Cheng stated that her "[t]reatment to date ha[d] been appropriate," *id.* at 931, and he did not

15    recommend stronger pain medication.  Instead, he said her future medical care should include her

16    pain medication, office visits, and injections.  *See id.* at 932.

17         From the end of 2012 through 2013, when Plaintiff began seeing Dr. Lin, he prescribed her

18    Tylenol with codeine for her pain.  *See, e.g.*, AR-2 at 1250, 1253, 1262, 1267, 1271, 1275, 1281,

19    1285, 1290, 1327, 1331, 1334, 1337, 1343, 1345, 1349, 1352, 1361, 1367, 1427.  She also

20    continued to take ibuprofen.  *See id.*  At the end of 2013, Dr. Lin noted that Plaintiff was having

21    gastrointestinal side effects from the pain medication.  *See id.* at 1349.  Rather than continuing to

22    increase her pain medication, Dr. Lin also recommended a program to help Plaintiff find other

23    ways to manage her pain.  *See, e.g.*, *id.* at 1255–56.  Although she was initially recommended for

24    such treatment, it was later determined she lived too far away and her insurance would not cover

25    it.  *See, e.g.*, *id.* at 1272, 1360, 1396.

26         When prescribing the Tylenol with codeine, Dr. Lin also flagged concerns that this

27    medication is "an opioid narcotic medicine and there is a potential for misusing, abusing or

28    diversion of medication."  *See, e.g.*, *id.* at 1286.  He therefore recommended random drug

screening tests to monitor Plaintiff's compliance.  *Id.*  He also cautioned Plaintiff about the use of NSAIDs.  *See id.*  In 2014, Dr. Yun similarly explained that "side effects, cost, and efficacy of medication versus physical methods and provider and patient preferences should guide the physician's choice of recommendations" for pain management.  *See id.* at 1429–30.  Dr. Yun therefore stated that he would "monitor the Tylenol [with codeine] load and subsequent risk of hepatic toxicity."  *Id.* at 1430.  In 2020, Plaintiff indicated that Dr. Duggal had also advised her that Tylenol was causing liver issues.[7]  *See* AR-3 at 2630–31.  Unsurprisingly, Plaintiff's treating physicians appeared concerned with balancing Plaintiff's need for pain relief with the possible side effects of using pain medication long term.

By 2015, Plaintiff was no longer taking the Tylenol with codeine, and Dr. Lin did not recommend it as part of her treatment.  *See* AR-2 at 1871–73, 1875.  Plaintiff was taking Motrin (ibuprofen), and Dr. Lin recommended a back brace.  *See id.* at 1875, 1881.  Plaintiff similarly confirmed with Unum in 2018 that she was still taking Tylenol and Aleve.  *See* AR-3 at 2162.

Similarly, Plaintiff had been taking over-the-counter medication for her migraines for many years.  *See* AR-1 at 209.  As Unum's reviewing physician, Dr. Mitchell, noted in 2011, "[w]orsening of Migraine Headaches is not an unusual complication of symptomatic cervical degenerative disease."  *See id.* at 407; *see also id.* at 587 (2007 medical record from Charlene Hu, M.D. indicating that migraines "likely triggered by neck problem").  Plaintiff's migraines and neck and back pain, therefore, appeared interrelated.  The Court does not, therefore, consider Plaintiff's treatment for her migraines in isolation.  In any event, in 2010, Dr. Pratt recommended she try a different medication for her migraines, but by October 2010, he noted that it had not been effective.  *See id.* at 864–65.  In early 2012, Plaintiff took Maxalt and ibuprofen for her migraines, and was given a prescription for Imitrex.  *See id.* at 882–84.  There is no indication in the record that this eased her symptoms.  *See id.* at 930.  Later that year, Dr. Pratt did not list any medications

---

[7] Neither Unum nor Dr. Russell, Dr. Lewis, or Dr. Bartlett discuss concerns about long-term opioid or NSAID use when evaluating whether Plaintiff's pain management protocol was appropriate.  As Plaintiff points out, there is an ongoing opioid epidemic, *see* Dkt. No. 35 at 20, and caution when prescribing and taking such medications for long-term use therefore seems reasonable.

for her migraine treatment.  *See id.* at 866.  By 2014, she was taking Maxalt and Excedrin Migraine.  *See* AR-2 at 1427.  In 2015, Plaintiff indicated that medication for her migraines only helped at times, and she did not currently have any migraine medication.  *See id.* at 1479.  Again in 2018, Plaintiff indicated that her migraines appeared related to her neck and back pain, and she would take Excedrin for them.  *See* Dkt. No. AR-3 at 2657.

That Plaintiff was taking Tylenol for her back pain and Excedrin for her migraines in 2020 was therefore not a change in the intensity of her treatment, but rather a continuation of her long-term pain management plan as recommended by her physicians.  *See id.* at 2578.

Unum next points out that Plaintiff saw Dr. Muzaffar in 2019 and Dr. Duggal in 2020 without asking for explicit help for her back and neck pain.  *See* Dkt. No. 33 at 1, 17.  But these records simply indicate that Plaintiff sought help for discrete and separate issues from her back and neck pain, such as when she injured her shoulder falling at home.  *See, e.g.*, AR-3 at 2381–2399.  This does not undermine the existence of her neck and back pain.  And in fact, the records from these appointments indicate that Plaintiff consistently complained of her back and neck pain. *See id.* at 2532–33, 2568–2604.  Unum points out that during a visit with Dr. Duggal, the doctor did not identify any findings of neurological deficits, muscle atrophy, or muscle weakness.  *See id.* at 2388–89, 2393.  Yet Plaintiff's medical records do not appear to ever have documented such symptoms—even during the time period in which Unum acknowledges that Plaintiff was disabled under the insurance plan due to neck and back pain.  In 2010, 2013, 2014, and 2015, Plaintiff's doctors reported that she still had "5/5" motor strength.  *See, e.g.*, AR-1 at 184, 213; AR-2 at 1429, 1872–73.  In 2014, Dr. Yun did not identify any atrophy, but he still concluded that Plaintiff had cervical and lumbar radiculopathy.  *See* AR-2 at 1429.  The absence of such findings in 2020 is therefore not significant with respect to the nature or severity of Plaintiff's conditions.

Lastly, Unum points out that Dr. Duggal and Dr. Rhee did not fill out disability paperwork for Plaintiff, even though Unum asked them to.  Despite Unum's urging, however, this does not undermine the evidence establishing Plaintiff's medical conditions either.  It does not prove that Plaintiff's condition improved or that she was not disabled.  Dr. Duggal saw Plaintiff for discrete issues unrelated to her back and neck pain, and Dr. Duggal's office indicated that they did not fill

22

1    out disability forms.  *See* AR-3 at 2770.  And in December 2020, Dr. Rhee told Unum that he had

2    only seem Plaintiff once at that time, had not reviewed the rest of her medical records, including

3    her prior MRIs, and therefore could not opine on her functional limitations.  *See id.* at 2756, 2762.

4    He did not, however, say that Plaintiff did not have any restrictions.  The Court declines Unum's

5    invitation to interpret these communications as somehow signaling the doctors' belief that Plaintiff

6    was not entitled to disability benefits or did not have any restrictions on her functional abilities.

7            Having reviewed the record in depth, the Court does not find the reasoning of Dr. Russell,

8    Dr. Lewis, or Dr. Bartlett persuasive or supported by the record.  The Court instead credits the

9    opinions of Plaintiff's treating physicians, particularly Dr. Lin, given his extensive treatment

10   history with Plaintiff and his expertise as a pain specialist.  As already discussed above, in August

11   2020, Dr. Lin continued to find that Plaintiff's condition was either the same or worse than it was

12   in 2017.  *Id.* at 2686.  As before, Dr. Lin found that Plaintiff could not lift, push, or pull over 10

13   pounds and could only occasionally reach over her shoulder.  *Id.* at 2674; *see also id.* at 2126

14   (Social Security findings).  Plaintiff, for her part, had also consistently reported that she was in

15   pain and that this pain affected her ability to perform daily tasks.  She lived with her son who

16   helped care for her, and rarely left the house.  *Id.* at 2756–57.  Plaintiff's physicians, and Judge

17   Flanagan who evaluated her during a hearing in her social security case, found her testimony

18   credible.  *See, e.g.*, *id.* at 2129.  There is nothing in the record to suggest that Plaintiff's

19   degenerative disease improved in the last few years or that her ongoing reports of pain were no

20   longer credible.

21          Unum suggests that Dr. Lin was simply signing off on disability forms, rather than

22   conducting a meaningful evaluation, but the Court finds no basis for this conclusion.  Dr. Lin had

23   a lengthy history treating Plaintiff.  His conclusions are also consistent with the ample prior

24   medical history, in which two MRIs showed cervical and lumbar issues and two separate doctors

25   concluded that she had reached maximum medical improvement.  The Court need not disregard

26   the objective evidence from the MRIs, which indicate degenerative conditions, simply because of

27   their age.

28          In *Hart v. Unum Life Insurance Co. of America*, for example, the plaintiff sought long-

United States District Court
Northern District of California

term disability benefits based on ongoing back pain.  253 F. Supp. 3d 1053, 1055–57 (N.D. Cal. 2017).  A 2001 and 2004 MRI indicated that the plaintiff had degenerative disc disease.  *See id.* at 1056–57.  Unum accordingly paid the plaintiff benefits from 2004 to 2011.  *Id.* at 1057–67.  Although Unum recognized the 2001 and 2004 MRIs, their reviewing physician—much like some of the reviewing physicians here—noted that "[n]o subsequent imaging studies have been performed and no EMG/NCS has been performed to provide electrodiagnostic evidence of radiculopathy, neuropathy or other pathology."  *See id.* at 1067.  The court, however, concluded that the plaintiff had nevertheless established that she was disabled under the definition of the insurance plan.  *See id.* at 1068–74.  The court based its reasoning, in part, on the fact that "there [were] objective MRI images confirming [the plaintiff's] back problems."  *Id.* at 1070.  The court explained that "while they may not be recent, they confirm [the plaintiff] has degenerative disc disease."  *Id.*  So too here.  Plaintiff had two MRIs, which both indicated degenerative spinal conditions.  *Cf. Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866–74 (9th Cir. 2008) (rejecting the suggestion that MRIs must establish further degeneration to sustain a finding of disability).

In short, Plaintiff's medical records indicate that there was no change in her condition over time, and that she has been continuously disabled since 2010.  Unum suggests that despite any continuity in Plaintiff's conditions, its prior payment of benefits is irrelevant to whether Plaintiff has established she is entitled to benefits now.  *See* Dkt. No. 33 at 19–20.  Although Unum is correct that the burden remains with Plaintiff to establish her entitlement to benefits, the Ninth Circuit has explicitly explained that the Court may consider a defendant's prior award of benefits: "[T]hat benefits had previously been awarded and paid may be evidence relevant to the issue of whether the claimant was disabled and entitled to benefits at a later date . . . ."  *See Muniz*, 623 F.3d at 1295–96; *accord McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (1st Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").  Here, none of Unum's reviewing doctors identified a change in Plaintiff's condition or care.  As described above, the distinctions Unum tries to draw between

United States District Court
Northern District of California

Plaintiff's past and current condition are just not supported by the record. The Court is left with the impression that when Plaintiff lost her health insurance and Unum took a closer look at her case, it decided to change the manner in which it evaluated her case. But Unum's decade-long approval of Plaintiff's benefits weighs in favor of the conclusion that she continues to have disabling medical conditions.

### B.     Gainful Occupation

During the hearing on the cross-motions, Unum's counsel suggested that even if Plaintiff's medical conditions may not have improved, Unum reconsidered its interpretation of Plaintiff's vocational history and her transferable skills on a closer review. Specifically, Unum urges that it had previously overlooked her significant managerial and supervisory experience. *See* Dkt. No. 33 at 22–24. When properly accounting for this extensive managerial and supervisory experience, Unum argues that the record establishes that Plaintiff could perform full-time sedentary work even accepting significant functional limitations. *Id.*

Unum relies on the conclusions that two of its vocational experts, Ms. Parras-Potenzo and Ms. Marosy, reached in 2020. Ms. Parras-Potenzo explicitly concluded that all prior reviews by Unum's own in-house vocational experts and the Social Security Administration's vocational expert were wrong. *See* AR-3 at 2750. She explained that these reviews failed to consider Plaintiff's experience and skill in personnel interviewing, training, management, event planning, and "8+ years' experience in sales that directly transfer to other industries." *Id.* Ms. Parras-Potenzo highlighted that from 2004 to 2006, Plaintiff worked at Clarins, and said that as part of this job, she was "in charge of 10 stores." AR-3 at 2749–50; *see also* AR-1 at 516–18, 952, 954. The Court finds that Unum simply overreads the nature of Plaintiff's experience.

Plaintiff reports that she was a beauty instructor, first for Nordstrom at a Clarins beauty counter, then directly for Clarins. *See* AR-1 at 516–18. Plaintiff did not say that she ran multiple retail stores or even multiple Clarins counters across different stores. Rather, Plaintiff indicated that she was responsible for *sales* of Clarins beauty products across multiple stores. *See id.* at 516. She described her job duties as "I had 10 Macy's & helping customer to learn about their skin, how to take care of it, teaching new sales person, make their goals for this month." AR-3 at 2464.

In response to a question "Did you supervise others?" on the form, Plaintiff wrote "Yes, train new person, interviewing, making their goals, and help them to make it." *Id.* at 2464.  As Plaintiff points out in her motion, this account does not support a finding that Plaintiff had previously unexplored managerial or supervisory experience.  *See* Dkt. No. 32 at 15.  When read in context, Plaintiff's answers on her work experience and education questionnaire simply describe Plaintiff's role as a traveling cosmetics representative for Clarins, where she would interact directly with Macy's customers to give beauty advice and ultimately sell Clarins cosmetic products.  She would help co-workers provide similar beauty advice and make their own sales goals.  When asked to describe her training, for example, Plaintiff listed "beauty products."  *See* AR-1 at 952.  There is simply nothing in the record that supports the conclusion that Plaintiff had the kind of high-level management skills that would be transferable to a job outside of the retail sale of cosmetics.

This is reinforced by a closer inspection of Ms. Marosy's opinions.  *See* AR-3 at 2752–55.  Based on Plaintiff's prior work history, Ms. Marosy listed Plaintiff's skills as falling into three categories:  "Craft Technology," "Customer Services," and "Business Administration."  *See id.* at 2754–55.

"Craft Technology" is defined as occupations that "are concerned with performing highly skilled hand and/or machine operations, utilizing special techniques, training and experience."  *See id.* at 2754.  Relevant work settings "include construction sites, machine shops, manufacturing establishments, and processing plants."  *Id.*  And the necessary skills include:

> Knowledge of tools, machines, materials, and methods used in trade or craft specialty; reading scale drawings or blueprints to visualize objects; using shop math to calculate object dimensions, material amounts needed, and material costs; coordinating eyes, hands and fingers to use hand tools or machines in constructing, making, or repairing objects; and adhering to object specifications or standards.

*Id.*  Neither Ms. Marosy nor Unum make any attempt to explain how Plaintiff's experience as a retail salesperson for cosmetics involved such specialty training or provided Plaintiff with any of these skills.

"Business Administration" appears similarly inapt.  *See id.* at 2754–55.  It involves

United States District Court
Northern District of California

occupations that "are concerned with directing and working through lower level supervisors to establish policies, set priorities, and render decisions in administering or managing all or part of the activities of public and private establishments and agencies." *Id.* at 2755.  The skills needed to perform these jobs include:

> Analyzing and interpreting mathematical information in written or diagrammatic form; speaking to large groups and writing clearly and authoritatively; making decision based on personal experience and judgment as well as verifiable facts and figures; planning long range or future projects; directing the work of others; working with complex financial and statistical data; and dealing with individuals and groups of people with diverse interests.

*Id.*  Although Plaintiff may have used her own experience to help others reach their sales goals, there is simply nothing in the record to suggest that Plaintiff has any of the other skills necessary for an occupation involving business administration.

Based on these skills, and Plaintiff's customer service experience, Ms. Marosy concluded that Plaintiff could be an Inside Sales Representative, Hotel Sales Representative, and Personnel Scheduler.  *See* AR-3 at 2755.  She does not explain what any of the typical duties of these occupations are or how Plaintiff's work experience qualified her to perform such duties.  To the extent these positions rely on "craft technology" and "business administration," Plaintiff does not have such skills.  Neither Ms. Parras-Potenzo nor Ms. Marosy's vocational opinions appear well-grounded in the facts of this case or Plaintiff's actual abilities.  The Court finds the opinions of Unum's prior vocational experts, and the vocational expert who evaluated Plaintiff as part of her social security claim, far more persuasive.  Looking at the record as a whole, the Court finds that Plaintiff's medical conditions prevent her from performing any gainful occupation to which she is reasonably fitted by education, training, or experience.

**C.    Regular Care**

Unum does not appear explicitly to dispute that Plaintiff has been in the regular care of a physician, as required under the policy.  But regardless, the Court finds sufficient evidentiary support.  Under the Policy, "regular care" is defined as:

United States District Court
Northern District of California

> [Y]ou personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
>
> [Y]ou are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

*See* AR-1 at 85.

As explained in Section III.A above, Plaintiff's treatment was consistent over time. Although she may have stopped attending physical therapy or receiving injections, she did not obtain meaningful relief from such treatments. Her doctors found that she had reached maximum medical improvement back in 2012, and she followed the instructions of her treating physicians. Unum has not offered any explanation of what additional steps Plaintiff should have been taking to manage her pain. The Court finds that the record supports a conclusion that she visited physicians as much as medically required and was receiving the most appropriate care for her conditions, even in January 2021.

*         *         *

The Court finds that the record establishes by a preponderance of the evidence that Plaintiff suffers from degenerative spinal disease and other conditions that cause her severe pain that make it impossible for her to work in any gainful occupation.

## IV.   CONCLUSION

The Court **GRANTS** Plaintiff's motion for judgment, Dkt. No. 32, and **DENIES** Defendant's motion, Dkt. No. 33. The Clerk is directed to enter judgment in favor of Plaintiff and to close the case. The parties may meet and confer regarding the filing and briefing schedule of any motion for attorneys' fees and costs.

**IT IS SO ORDERED.**

Dated:   9/15/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California